**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DR. VALENTIN GAPONTSEV<br>31 Hickory Drive<br>Worcester, MA  01609 | )<br>)<br>)<br>) |
| IPG PHOTONICS CORPORATION<br>50 Old Webster Road<br>Oxford, MA 01540 | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 1:18-cv-_____<br>)<br>) |
| UNITED STATES DEPARTMENT OF THE<br>TREASURY<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220 | )<br>)<br>)<br>)<br>) |
| THE HONORABLE STEVEN MNUCHIN,<br>in his official capacity<br>as Secretary of the United States Department<br>of the Treasury,<br>1500 Pennsylvania Avenue, NW<br>Washington, D.C. 20220 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      In Section 241 of the Countering America's Adversaries Through Sanctions Act ("CAATSA"), Pub. L. 115-44, Congress required the Secretary of the Treasury (the "Secretary") to designate individuals as "oligarchs in the Russian Federation, as determined by their closeness to the Russian regime" led by President Vladimir Putin and their net worth.  The Secretary was to consider "indices of corruption," their "relationship" with President Putin, and their "sources of wealth," all through consultation with the relevant intelligence agencies.  The term Russian "oligarch" was not invented by Congress.  It plainly refers to friends of high-ranking Russian government officials whose wealth is primarily derived through corrupt grants of public assets by the Russian government.

2.      On January 29, 2018, the Secretary submitted his Section 241 Report to Congress.  Attached as Appendix B to the public report is the Secretary's list of Russian oligarchs (the "List of Oligarchs").  The Secretary's report and List of Oligarchs reflects no serious inquiry by the Secretary in fulfilling his statutory obligation under CAATSA. Instead, the Secretary effectively republished the list of Russian billionaires from the March 28, 2017 issue of *Forbes* Magazine.

3.      The Secretary included on his list of Russian oligarchs the world-renowned physicist, Dr. Valentin Gapontsev.  Dr. Gapontsev is a U.S. citizen; and he is the founder, Chairman and Chief Executive Officer of IPG Photonics Corporation ("IPG Photonics"), a publicly-traded company, listed on NASDAQ and headquartered for nearly the last two decades in Oxford, Massachusetts.  Dr. Gapontsev's wealth comes from his invention of market-leading industrial laser technologies, not from any corrupt parceling out of public assets to cronies of President Putin.  Nonetheless, in composing the statutory List of Oligarchs, the Secretary arbitrarily and capriciously lumped Dr. Gapontsev in with friends

2

of Russian President Vladimir Putin, whose wealth is built on gifts and grants from the Russian Government.  The Secretary's designation of Dr. Gapontsev as a CAATSA Section 241 oligarch has harmed Dr. Gapontsev, and the company he leads.  Plaintiffs seek an order vacating the Secretary's final action designating Dr. Gapontsev as an "oligarch" under Section 241 of CAATSA as arbitrary, capricious, and contrary to law.

4.      The statutory requirement that the Secretary designate individuals as Russian oligarchs springs from Congress's effort to force the Administration to punish Russian Government acts of aggression in Ukraine and Syria and its efforts to interfere with elections in the United States, through imposing sanctions on individuals close to the ruling Russian regime.  Congress required the Secretary of the Treasury, in consultation with the State Department and the Director of National Intelligence, to determine a list of individuals who should be designated senior foreign political figures or oligarchs in the Russian Federation.  Congress required the Secretary to assess an individual's *ties to the Russian Government, indicia of corruption and the source of his wealth, based on intelligence gathered by the national security agencies*.  To that end, Congress gave the Secretary a specific list of factors to consider in determining who is a Russian oligarch: (a) the individual's "closeness to the Russian regime and [the individual's] net worth"; (b) the relationship between the individual and "President Vladimir Putin or other members of the Russian ruling elite"; (c) the "identification of any indices of corruption with respect to th[e] individuals"; (d) the "estimated net worth and known sources of income of th[e] individuals and their family members . . . including assets, investments, other business interests, and relevant beneficial ownership information"; and (e) "identification of the non-Russian business affiliations of those individuals."  Section 241, CAATSA.  The purpose of these statutory factors is plain:  To require the identification of those Russian nationals

who are close confidants of President Putin and have no other explanation for their vast wealth other than corrupt distributions of public assets from the Putin regime. The Secretary's report reflects none of the required analysis. If the public report and List of Oligarchs had been created in accordance with the analysis required by CAATSA, the Secretary would not have designated Dr. Gapontsev as a Russian oligarch.

5.      In designating Dr. Gapontsev as a Russian oligarch the Secretary took a final agency action that is arbitrary, capricious, and/or contrary to law. First, the Secretary's public report does not reflect any consideration of the CAATSA statutory factors. The Secretary's public report does not include an examination of Dr. Gapontsev's connection to the Russian regime; if it had, it would be evident to all that Dr. Gapontsev has no such connection. The Secretary's public report does not include an examination of whether Dr. Gapontsev had been granted public assets by the Russian Government; if it had, it would be evident to all that Dr. Gapontsev's wealth derives from his own innovations in laser technology and the U.S.-based, U.S.-listed, U.S.-headquartered publicly-traded company that Dr. Gapontsev runs and that employs thousands of individuals in the United States. The Secretary's public report does not reflect an examination of whether Dr. Gapontsev's wealth had derived from corrupt activity; if it had, it would be evident to all that Dr. Gapontsev's wealth derives from his nearly 100 worldwide and nearly 40 U.S. patents and the market-leading technology that he invented and implemented through IPG Photonics Corporation. Further, there is no support in CAATSA that Congress intended the Secretary's public Russian oligarch designations to be based on the simple fact that an individual had $1 billion or more in assets, which was the only requirement for being included on the *Forbes* March 28, 2017 list of Russian billionaires.

6.      Second, the Secretary did not afford Dr. Gapontsev any due process of law.

There is literally no procedure, according to U.S. Department of the Treasury ("Treasury") officials, for challenging Dr. Gapontsev's inclusion on the Secretary's List of Oligarchs. Nor was the lack of post-designation process compensated for by process available before the Secretary made the designation.  The designation was made with no notice to Dr. Gapontsev, much less an opportunity to comment and/or provide contrary evidence.

7.     Third, the Secretary unconstitutionally delegated an official governmental decision to a private party, by effectively adopting a list of Russian billionaires that had been compiled by *Forbes* Magazine, now owned by Hong Kong investors.  The Constitution requires that official government actions be taken by officers of the United States.  This requirement—articulated by the Supreme Court as the private non-delegation doctrine—is found in the Vesting Clause, which vests the Executive Power in the President, through the Appointments Clause, which requires all persons exercising substantial governmental authority to be appointed in certain manners, separation of powers principles established in the Constitution, among other constitutional provisions. No one appointed in any manner provided for in the Constitution foreign-owned *Forbes* Magazine to make official U.S. government decisions; but the Secretary ceded its authority to *Forbes*. Paradoxically, *Forbes* Magazine afforded Dr. Gapontsev more process than his own U.S. government, removing Dr. Gapontsev from the list of Russian billionaires after determining that Dr. Gapontsev was a U.S. citizen, whose wealth primarily derived from his founding of a successful U.S. company.

8.     Fourth, the agency's continued inclusion of Dr. Gapontsev on the list of designated Russian oligarchs violates the Privacy Act, 5 U.S.C. § 552a.  Treasury's maintenance of a false record has caused injury to Dr. Gapontsev and to IPG Photonics Corporation and violates the Privacy Act.  5 U.S.C. §552a.

9.     Accordingly, and as set forth below, the Court should vacate and set aside the Secretary's designation of Dr. Gapontsev as a Russian oligarch under Section 241 of CAATSA.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Plaintiffs' causes of action arise under the laws and Constitution of the United States, including the CAATSA, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*; the Fifth Amendment to the United States Constitution; the Vesting Clause of the United States Constitution; the Appointments Clause of the United States Constitution; separation of powers principles established in the United States Constitution; the private Non-Delegation Doctrine derived from the United States Constitution; and the Privacy Act, 5 U.S.C. § 552a.

11.     Venue is proper in this district under 28 U.S.C. § 1391.   Defendant Department of the Treasury resides in this district.  Defendant Steven Mnuchin performs his official duties in this district.

12.     An actual controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief to set aside the Secretary's designation of Dr. Gapontsev as a Russian oligarch and to issue all necessary and appropriate process to preserve Plaintiffs' status or rights pending conclusion of the proceedings, as requested herein.  28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 705, 706.

## PARTIES

13.     Plaintiff Dr. Valentin Gapontsev is a citizen of the United States.  He resides in Worcester, Massachusetts.  Dr. Gapontsev moved to the United States in 2001 with his family, obtained U.S. permanent resident status in 2003, and became a United States citizen in 2008, while not renouncing his Russian citizenship.  Dr. Gapontsev is the Founder,

Chairman, and Chief Executive Officer ("CEO") of Plaintiff IPG Photonics Corporation.

14.     Plaintiff IPG Photonics Corporation ("IPG Photonics") is a publicly-traded company, incorporated in Delaware, with its principal place of business in Oxford, Massachusetts.  IPG Photonics is an S&P 500 company that develops, manufactures, and sells fiber lasers for use in various manufacturing and other processes.  IPG Photonics directly employs more than 2,100 Americans across 10 states.  It is one of the largest employers in the area surrounding Worcester, Massachusetts, bringing nearly 2,000 well-compensated, high-tech jobs to the region.

15.     Dr. Gapontsev's active participation is critical to the financial well-being of IPG Photonics.  As a result, the Secretary's final action in designating Dr. Gapontsev as a Russian oligarch has caused direct injury both to Dr. Gapontsev and to IPG Photonics, for which there is no administrative remedy.  Plaintiffs have standing to bring this suit because Defendants' actions have caused direct injury to Dr. Gapontsev and to IPG Photonics, which injuries will be remedied by a favorable ruling from this Court.

16.     Defendant Department of the Treasury is an executive department of the United States Government.  Treasury is headquartered in Washington, D.C.

17.     Defendant Steven Mnuchin is Secretary of Treasury (the "Secretary") and is sued in his official capacity.  The Secretary oversees Treasury's activities with respect to the Russian oligarch designation under Section 241 of CAATSA.

## **BACKGROUND**

**A.      Dr. Gapontsev Invents Groundbreaking Fiber Laser Technology and Founds IPG Photonics**

18.     Dr. Valentin Gapontsev was born in the Soviet Union in 1939.  Dr. Gapontsev spent his childhood in the Ukraine.  He obtained a master's degree in electronics

from Lvov Polytechnic Institute and then spent three years working at a high-tech company in Lvov, Ukraine.  Dr. Gapontsev then obtained his Ph.D. in Laser Materials Science from the Moscow Institute of Physics and Technology.

19.     Until shortly after the fall of the Soviet Union, Dr. Gapontsev worked at the Soviet Academy of Sciences ("SAS").  The SAS was the country's elite institution for its most talented scientists.  As the Soviet Union fell apart, Dr. Gapontsev decided to start his own company focused on researching fiber-based lasers and amplifiers.  To that point, industrial lasers were then dominated by Carbon Dioxide and crystal lasers; fiber lasers had very low output power and were expensive, which limited their effectiveness in manufacturing and other applications.  Dr. Gapontsev had a different idea:  In 1990, Dr. Gapontsev and I.E. Samartsev published a scientific paper discussing the feasibility of development of "simple, compact, reliable and low cost devices with an output power on the order of tens or with hundreds of watts."  V.P. Gapontsev and I.E. Samartsev, *High-Power Fiber Laser, in* Advanced Solid-State Lasers; Proceedings of the Topical Meeting, Salt Lake City, UT, Mar. 5-7, 1990, Washington, DC, Optical Society of America, 1991.  Based upon experimental data from their tests, the paper was the first to suggest that fiber lasers, with a very high output power density, could be a viable alternative technology to other lasers in many applications.

20.     Dr. Gapontsev continued researching this idea in the rented basement of a small laboratory at the SAS, using his small savings of a few thousand dollars and working with a handful of students.  That company was called STC IRE-Polus Partnership.

21.     Dr. Gapontsev's first business breakthrough came in 1993.  It was not from a Russian government grant or give away.  It came from a Western European corporation convinced that Dr. Gapontsev's innovations could transform its business.  Italtel, a large

Italian telecommunications company, contracted with Dr. Gapontsev's company for a high-powered erbium doped fiber amplifier.  In 1994, Dr. Gapontsev convinced DaimlerBenz Aerospace (Dornier) to develop the world's first eye-safe laser transmitter for a helicopter obstacle warning system.  Both companies wanted the products manufactured in Western Europe, so Dr. Gapontsev opened a manufacturing facility in Germany.  It was at this German facility that Dr. Gapontsev developed and introduced the first generation of various high volume fiber lasers and amplifiers.

22.     Dr. Gapontsev's next business breakthrough came in 1997, when the company's products were qualified for use in BellSouth, a large regional telecommunications company, for the first large fiber-optic network in the United States. Reflecting the importance of these U.S. contracts, Dr. Gapontsev established IPG Photonics Corporation in Massachusetts, with Delaware as the company's state of incorporation.

23.     The main assets of Dr. Gapontsev and his company were the knowledge, creativity, and work ethic of Dr. Gapontsev himself.

24.     Dr. Gapontsev's capital raises for the company's expansion were hardly gifts from Russian government leaders and their cronies.  In 2000, Dr. Gapontsev raised $100 million of private-equity investments from U.S.-based TA Associates and Merrill Lynch, which took a minority ownership in IPG Photonics.

25.     Months later, IPG Photonics opened its headquarters and U.S. manufacturing facility in Oxford, Massachusetts.  Today, that facility employs nearly 1,600 individuals in well-compensated, high-tech jobs.

26.     In connection with opening IPG Photonics' headquarters in Oxford, Massachusetts, Dr. Gapontsev relocated himself and his family to the United States, settling in Worcester, Massachusetts.  He received his green card in 2003 after going through the

application process and became a naturalized United States citizen in 2008.

27.     During the tech crash in 2001, the telecom industry was hit hard.  Dr. Gapontsev retooled his company to advance fiber laser technology and apply it to manufacturing.  During this difficult period, Dr. Gapontsev retained as many U.S. employees as possible, investing millions of his own dollars to keep the company afloat. The result, through Dr. Gapontsev's own expertise and that of his employees, was the development and production of high-power fiber lasers for manufacturing applications, pump diode technology (to reduce the company's component costs and increase power), and other critical optical components and modern production lines.

28.     In December 2006, IPG Photonics launched its initial public offering and listed on the NASDAQ Stock Exchange.  In its prospectus, IPG Photonics stated:  "Our future success is substantially dependent on the continued service of our executive officers, particularly our founder and chief executive officer, Dr. Valentin P. Gapontsev . . . ."  IPG Photonics Corporation, Form 424B4, at 11 (Dec. 13, 2006).  The company used the proceeds from its initial public offering to invest in a new plant and equipment at its Oxford, Massachusetts headquarters.

29.     In 2010, IPG Photonics introduced its first quasi-continuous wave fiber lasers into the market.  IPG Photonics has continued to work to increase the power of its products.  For example, in 2013, IPG Photonics sold the world's first 100 kilowatt commercial fiber laser, which is used to weld together metal parts 300 millimeters thick. In 2016, IPG Photonics introduced its Laser Luminaire RGB light source for digital projection replacing conventional xenon bulb cinema projection.

30.     At the time of IPG's IPO, net sales had been $96.4 million for 2005 and $101.1 million for the nine months ending September 30, 2006, but by 2016 IPG Photonics'

net annual sales were in excess of $1 billion.

31.     IPG Photonics' growth and successes have been driven by Dr. Gapontsev's ingenuity and investment in the company's technologies, products, and processes.

32.     In 2017, IPG Photonics had revenues of $1.4 billion and employed more than 2,000 people across the United States.  IPG employs a highly skilled workforce with long-term, loyal employees who bring consistent and robust income to local communities.

33.     Dr. Gapontsev and trusts he created currently control, directly or indirectly, approximately 31 percent of IPG Photonics shares.  The remaining shares are owned primarily by institutional investors.  Based upon information and belief, no IPG Photonics shares are owned by the Russian government.

34.     Dr. Gapontsev and IPG Photonics, in addition to growing a successful business, have been key contributors to the broader scientific community in the United States and abroad.  For example, Dr. Gapontsev and IPG Photonics established the IPG Photonics Laboratory at Worcester Polytechnic Institute ("WPI"); co-founded the Siegman International School of Lasers; and funded a biophotonics fellowship, created by the Optical Society of America.  Dr. Gapontsev has won numerous awards, including the Ernst & Young Entrepreneur of the Year for New England (2006); the Laser Institute of America's Arthur L. Schawlow Award (2009); and the Russian Federation National Award in Science and Technology honoring individuals for their contributions to laser applications in science, industry, education or medicine (2011).  Additionally, Dr. Gapontsev was named a Fellow of the Optical Society of America in 2011 for his "technical leadership in developing [] high power fiber lasers and vision and business leadership in commercializing high power fiber lasers."  Letter from The Optical Society of America to Dr. Valentin P. Gapontsev (Nov. 4, 2011).

**B.**     **Scientific Innovation and Hard Work, and Resulting Contracts With Western Companies, Drove Dr. Gapontsev's and IPG Photonics' Success**

35.     The successes of Dr. Gapontsev and IPG Photonics have been entirely market-driven:  The result of arms-length contracts with many U.S., European, and Chinese private companies.  Only a small portion of IPG's total revenue is generated from Russian sales. The successes have not been the result of corrupt or otherwise inappropriate Russian government assistance or involvement.

36.     The commercial acceptance of high power fiber lasers in large scale manufacturing operations in the last five years, nearly two decades after Dr. Gapontsev moved to the United States and IPG Photonics established its headquarters in Massachusetts, is responsible for substantially all of Dr. Gapontsev's wealth.  Between 2013 and 2017, IPG Photonics' net income rose from $155,780,000 to $347,588,000, and the shareholders' equity in the company rose from $927,969,000 to $2,022,322,000.  IPG Photonics 2017 Annual Rpt. at 34-35.  Nearly all of Dr. Gapontsev's wealth is derived from his stake in IPG Photonics.

37.     Dr. Gapontsev's fiber lasers are disruptive technology that changed how scientists and engineers think of and use lasers.  The fiber lasers are more efficiently able to produce light at a much shorter wavelength than traditional $CO_2$ lasers, making Dr. Gapontsev's lasers effective for a broader range of applications including metal processing. IPG's fiber lasers have the highest output powers, electrical efficiency, beam quality and reliability compared to other types of lasers.

38.     Recognized as the "father of the fiber laser industry" by the Laser Institute of America, Dr. Gapontsev personally holds nearly 100 patents worldwide, including nearly 40 in the United States.  He has written more than 250 scientific publications.

39.     Just as he was in 1990, Dr. Gapontsev remains critical to the financial health and continued innovations and success of IPG Photonics.   As a result, IPG Photonics Corporation has a direct interest in Dr. Gapontsev's reputation and ability to do business unimpeded by arbitrary government actions.   In its 2017 Annual Report, IPG Photonics stated:

> *We rely on the significant experience and specialized expertise of our senior management and scientific staff and if we are unable to retain these key employees and attract other highly skilled personnel necessary to grow our business successfully, our business and results of operations could suffer.*
>
> Our future success is substantially dependent on the continued service of our executive officers, particularly our founder and chief executive officer, Dr. Valentin P. Gapontsev, age 79, and the chief operating officer, Dr. Eugene Scherbakov, age 70, our highly trained team of scientists, many of whom have numerous years of experience and specialized expertise in optical fibers, semiconductors and optical component technology, and other key engineering, sales, marketing, manufacturing and support personnel, any of whom may leave, which could harm our business.

IPG Photonics 2017 Annual Rpt. at 23.

40.     Dr. Gapontsev's initial investment of a few thousand dollars in his fiber laser company has grown, through scientific invention, hard work, and risk taking.

## C.      Dr. Gapontsev's Assets Are Located in the United States

41.     Dr. Gapontsev holds more than 98 percent of his assets in the United States. Virtually the entirety of Dr. Gapontsev's wealth has come from his innovations and the success of IPG Photonics.

42.     In March 2017, Dr. Gapontsev was included on the *Forbes* Magazine listing of Russian billionaires.   *Forbes 2017 Billionaires List:  Meet the Richest People on the Planet*, FORBES (March 28, 2017).   Forbes subsequently corrected its listing and now lists Dr. Gapontsev on the list of American billionaires, noting that Dr. Gapontsev holds

both U.S. and Russian citizenship, but that his residence, company, and wealth are based in the United States. *The World's Billionaires*, FORBES (Dec. 3, 2018 3:26 PM), https://www.forbes.com/billionaires/list/#version:static_header:country_countery:United%20States; FORBES, https://www.forbes.com/profile/valentingapontsev/?list=biollionaires#2b56e4401a0c, (last visited Dec. 3, 2018).

43.     When ranked by dollar volume of sales, not even one of IPG Photonics' top forty customers for fiscal year 2017 is headquartered in Russia.  By region, 44% of the company's sales are to companies in China, 12% of the company's sales are to companies in the United States, 8% of the company's sales are to companies in Germany, 21% of the company's sales are to "Other Europe," and 15% of the company's sales are to "Other Asia."  Of this 15%, approximately 2% of total sales were in Russia.  IPG Photonics Investor Guidebook, Nov. 2018, at 29.  IPG Photonics' U.S. customers include the United States Government and government contractors such as Lockheed Martin, Boeing, and many others.

**D.     Neither Dr. Gapontsev, Nor His Wealth, Nor the Success of IPG Photonics Is Tied to President Putin's Government**

44.     Neither Dr. Gapontsev nor IPG Photonics owes its success to President Putin or to other senior Russian government officials, past or present.

45.     Dr. Gapontsev, through his intellect and scientific innovation, established and built IPG Photonics.  To succeed, Dr. Gapontsev had to relocate his business outside of Russia and operate under the legal frameworks of the United States and other countries in which IPG Photonics operated.

46.     Dr. Gapontsev has met Mr. Putin only once, when receiving the country's highest award for scientific accomplishment by persons of Russian descent in 2011.  That

award, which was only honorary, came after Dr. Gapontsev's inventions and after his commercial success in the West.

47. Dr. Gapontsev was not a beneficiary of Mr. Putin and other Russian leaders dispensing publicly-owned businesses and resources to their friends after the fall of the Soviet Union. As that was happening, Dr. Gapontsev was inventing new laser technologies and obtaining contracts from European companies on the basis of those innovations.

48. "Russian oligarch" is a widely understood term. It refers to the few friends of prominent Russian leaders who were corruptly allocated public assets and became rich from it. Dr. Gapontsev is the polar opposite of a Russian oligarch. He had no friends in high places in the Russian Government. His wealth came exclusively from his individual scientific innovation and global market demand for his unique products. He is not a "Russian oligarch."

**E.      Countering America's Adversaries Through Sanctions Act ("CAATSA")**

49. On August 2, 2017, the Countering America's Adversaries Through Sanctions Act ("CAATSA") became law. Congress passed this law for the purpose of prompting further sanctions against Russian individuals closely associated with the Putin regime. The purpose of such sanctions was to punish the conduct of the Russian government, including interference in U.S. elections, cyber-attacks, and military aggression in the Ukraine and Syria.

50. Congress established a framework to facilitate and to require the imposition of sanctions against Russian individuals closely associated with the Putin regime.

51. To identify those who should be sanctioned, Congress required the Secretary of the Treasury to designate individuals who qualify as Russian oligarchs.

52. Most relevant here, in Section 241, CAATSA provides:

(a) IN GENERAL.--Not later than 180 days after the date of the enactment of this Act, the Secretary of the Treasury, in consultation with the Director of National Intelligence and the Secretary of State, shall submit to the appropriate congressional committees a detailed report on the following;

(1) Senior foreign political figures and oligarchs in the Russian Federation, including the following:

(A) An identification of the most significant senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth.

(B) An assessment of the relationship between individuals identified under subparagraph (A) and President Vladimir Putin or other members of the Russian ruling elite.

(C) An identification of any indices of corruption with respect to those individuals.

(D) The estimated net worth and known sources of the income of those individuals and their family members (including spouses, children, parents, and siblings), including assets, investments, other business interests, and relevant beneficial ownership information.

(E) An identification of the non-Russian business affiliations of those individuals.

53.     Section 241 reinforces the common understanding of the meaning of the term "Russian oligarch," requiring that oligarchs be determined "by their closeness to the Russian regime" and requiring an assessment of their "known sources of income," "indices of corruption," and "non-Russian business affiliations" that might otherwise explain their wealth.

54.     Section 241(b) of CAATSA provided that the Section 241 report "shall be submitted in unclassified form, but may contain a classified annex."

**F.     The Secretary of the Treasury Arbitrarily and Capriciously Designates Dr. Gapontsev as a Russian Oligarch under CAATSA Section 241**

55.     On January 29, 2018, the Secretary of the Treasury published in the Federal Register a "Report to Congress Pursuant to Section 241 of the Countering America's

Adversaries Through Sanctions Act of 2017 Regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities" ("Treasury's Section 241 Report").

56.     In his Section 241 Report, the Secretary stated that he was "providing in this unclassified report a list of senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth," suggesting the Secretary actually performed an analysis, but then further stated that "[t]o determine the list of oligarchs, the Department of the Treasury enumerated those individuals who, *according to reliable public sources*, have an estimated net worth of $1 billion or more." Treasury's Section 241 Report, at 1 (emphasis added).

57.     Treasury's Section 241 List of Oligarchs was set out in Appendix B to Treasury's January 29, 2018 Section 241 Report.   The Secretary's List of Oligarchs mirrored the *Forbes* March 28, 2017 list of Russian billionaires; it appears to have merely put the list in alphabetical order.   The Secretary's apparent republishing of the *Forbes* March 28, 2017 list of Russian billionaires does not reflect any consideration of the listed individuals' ties (or lack thereof) to President Putin and the Putin Government, the sources of the individuals' wealth, whether there existed any indices of corruption, or the non-Russian business affiliations and sources of wealth of the listed individuals.

58.     The Secretary's public List of Oligarchs does not reflect consideration of the factors set out by Congress; nor does it reflect any independent analysis by the Secretary of the nationality or net worth of the listed individuals.

59.     Upon information and belief, Dr. Gapontsev is the only person included on the List of Oligarchs who is a United States citizen.

60.     Upon information and belief, the Secretary also submitted a classified annex

to the oligarchs designation report to Congress.  According to the unclassified report to Congress, the classified annex may include other individuals for designation as oligarchs that are not identified in the unclassified report.

61.     Upon information and belief, the classified annex may include analysis of the designated oligarchs' sources of wealth, indicia of corruption, and relationship with President Putin.  Any serious analysis of Dr. Gapontsev would show that he has no relationship with the Russian regime and that his wealth arises from purely legitimate sources, not from closeness to the Russian regime.  The Secretary arbitrarily and capriciously chose to make any such analyses classified, leaving the reputational stain of the U.S. Government's official public oligarch designation without any of the analysis that would make plain to IPG Photonics' customers and counterparties that Dr. Gapontsev is not associated with the Russian regime, is not corrupt, and is unlikely to suffer the same legal fate as President Putin's true cronies.

62.     The decision to submerge the analysis of the required statutory factors into a classified annex, and indeed to include other oligarch designees in the classified annex, is contrary to the plain statutory text of CAATSA.  Section 241(a) required "*the report*" to include analysis of the statutory factors, including each individual's "closeness to the Russian regime," his relationship with President Putin, his "indices of corruption," his "sources of wealth," and his "non-Russian business affiliations." (emphasis added). Section 241(c) then mandated that "*the report* required under subsection (a) shall be submitted in an unclassified form." (emphasis added).  That means the required content of the report had to be submitted in unclassified form, including analysis of each of the statutory factors required in subsection (a).  Although the Act contemplates that the Secretary also may submit "a classified annex to the report," which presumably could

include the classified bases or sources and methods used to derive the analysis in the report, the Secretary's unclassified report contains *none* of the statutorily required analysis. The requirement that the report, including its analysis of the statutorily required factors, be submitted unclassified is not some irrelevant government paperwork mandate. The requirement is *for the protection of those who are designated as oligarchs* so the public can assess why they were designated and the likelihood of further adverse government actions. The Secretary's arbitrary and capricious decision to submit only a list of oligarchs, with none of the statutorily required analysis, in the unclassified report deprived Dr. Gapontsev and IPG Photonics of this crucial protection.

63.    By the time of the release of its March 2018 edition, *Forbes* Magazine had realized its mistake in including Dr. Gapontsev on the list of Russian billionaires and instead included him on the magazine's list of American billionaires.

64.    Requests of Congressmen and Dr. Gapontsev's representatives for removal of Dr. Gapontsev from the List of Oligarchs have been met with no substantive response from Treasury. Supporters included the Optical Society of America, the President of the U.S. Russia Business Council, a former Secretary of the U.S. Navy, the Town of Oxford, and suppliers and employees of IPG Photonics.

65.    Dr. Gapontsev's representatives have met with the Treasury Department and provided a list of his assets and asset locations. Despite these efforts, the Secretary has refused to remove Dr. Gapontsev from the Section 241 List of Oligarchs and has informed Dr. Gapontsev and IPG Photonics that there is no mechanism in place by which an individual can seek to be removed from Treasury's List of Oligarchs.

**G.      Dr. Gapontsev and IPG Photonics Have Been Harmed by the Secretary's Designation of Dr. Gapontsev as a Russian Oligarch**

66.      Dr. Gapontsev and IPG Photonics fear the Secretary's designation of Dr. Gapontsev as a Russian oligarch has affected, or will affect, their business, including their interactions with customers and financial institutions.  Given the significant ownership stake that Dr. Gapontsev and the Gapontsev family trusts have in the company, the Secretary's designation of Dr. Gapontsev as a Russian oligarch necessarily affects IPG Photonics.  Counterparties of IPG Photonics have made statements to company personnel to the effect that IPG Photonics is on Treasury watch lists and has been red-flagged as a sanctions list company.  At least one counterparty stated they assumed that IPG Photonics, due to its founder, CEO, and substantial owner's designation as a Russian oligarch by the Secretary, is effectively disqualified from doing business with U.S. persons and corporations.

67.      Particularly affected is Dr. Gapontsev and IPG Photonics' business with U.S. Government contractors.  Dr. Gapontsev and IPG Photonics have worked to grow this small part of Plaintiffs' business.  IPG Photonics' Director of Advanced Applications has a U.S. Government security clearance, which permits him to discuss the Government's technology needs with U.S. Government agencies and to propose IPG Photonics laser solutions for those needs.  U.S. Government officials and contractors have told IPG Photonics personnel that they believed they could no longer work with IPG Photonics due to the Secretary's designation of Dr. Gapontsev as a Russian oligarch.  One contractor even expressed surprise that IPG personnel were bothering to attend a classified symposium regarding U.S. Government laser needs given Dr. Gapontsev's designation.

68.      IPG Photonics has had to devote time and resources to addressing the

Secretary's List of Oligarchs.  The company has been required to field questions relating to the Secretary's designation of Dr. Gapontsev and to convince customers that they still may legally do business with IPG Photonics.  IPG Photonics is concerned that it has lost or may lose business opportunities and that the Secretary's designation of Dr. Gapontsev may affect the willingness of certain potential customers to work with IPG Photonics due to concern that the designation will in some way disqualify IPG Photonics from completing any contract.

69.     At least one third-party trade compliance system, Visual Compliance, flagged Dr. Gapontsev in its system as posing a problem after the Secretary submitted his List of Oligarchs to Congress.  Being flagged on a database like Visual Compliance may result in third parties being unwilling to do business with the flagged individual or any businesses associated with that individual.  That effect is made plain by advice appearing on the website of the International Compliance Professionals Association regarding the oligarch designation; those entries suggest that the designated individuals "are suspected of working for a Russian defense or intelligence agency" and that companies should "[u]se caution when dealing with anyone on th[e] list."  The Secretary's designation of Dr. Gapontsev as a Russian oligarch has required the company to divert time and other assets to clarifying the significance of the designation.  Following the Secretary's submission of the CAATSA Section 241 List of Oligarchs to Congress, IPG Photonics has reason to believe that it has not received product orders that it expected were going to be placed.

70.     Additionally, since the Secretary's designation of Dr. Gapontsev as a Russian oligarch, IPG Photonics has been subjected to additional inquiries from the company's banking facilities.  IPG Photonics did not receive these types of inquiries before the Secretary's designation of Dr. Gapontsev.  These new inquiries are consistent with the

April 18, 2018 letter that Senators Jeanne Shaheen and Sheldon Whitehouse sent to major

U.S. financial institutions, encouraging those institutions to red-flag and conduct extended

due diligence on any person included on the oligarchs list.  The letter goes further to demand

that the financial institutions report to Congress their financial dealings with the oligarchs,

presumably under pain of further compulsory demands or subpoenas.  Banking institutions

generally are reluctant to ignore demands from senators on committees with financial

industry oversight.  The Senators' letter states:

> Given their wealth and relationship to the Russian state, many oligarchs in Russia either wield or are susceptible to considerable political influence.  These individuals often have global financial dealings, including in the U.S., through luxury real estate, personal property, or other interests, and may utilize the U.S. financial system to conduct some of their activities. Unfortunately, the net worth of many of these individuals is frequently generated by business conduct that can blur the line between private wealth and state resources.  In some examples, the private fortunes of Russian oligarchs were acquired through the privatization of state-owned assets conducted in a manner which unjustly enriched them and in an environment subject to corruption and abuse.  In fact, many oligarchs have been known to use their assets to shield the state from the impact of sanctions….

> As mentioned, the Treasury Department released this unclassified report on January 29, 2018.  The report identified 96 Russian oligarchs with a net worth of $1 billion or more.  While the names were compiled from public sources such as the *Forbes* list of billionaires, Secretary Mnuchin warned during testimony before the Senate Banking Committee on January 30:  "There will be sanctions that come out of this report."…The law explicitly requires that the January 2018 report, and not just the sanctions designations alone, should guide banks and help to detect and deter the exploitation of our financial system by Russian oligarchs and senior political figures, some of whom may have engaged in acts of corruption and the privatization of state-owned assets in a way which unjustly benefited state officials or their family members, or other sanctionable conduct.

> Given the importance of this issue to national security, and to gain a better understanding of the extent of this problem and what financial institutions may be doing about it, please provide the answers to the following questions:

>> 1. During the past 5 years, as part of its normal due diligence program or triggered by internal concerns about suspicious activity,

has [your bank] identified, or conducted any review to determine if it has any account (including but not limited to personal, commercial or correspondent accounts) that is controlled by or contains any assets that belong to or are controlled by any individual on the January 29, 2018 list of oligarchs or senior Russian political figures, or if [your bank] has any financial arrangement (including but not limited to any loan, line of credit or margin account) or has provided any service to any individual, or any entity controlled by any individual, on the list ["applicable account, financial arrangement or service"]?  If so, please provide the following information:

. . .

c.  Whether any applicable accounts, financial arrangements or services were identified as being held by or provided to any individual or individuals on the list.  If so, for each applicable account, financial arrangement or service -- grouped by common control or beneficial owner -- please provide the following information:

i. The type, amount or value (as appropriate) of any account, financial arrangement or service provided;

ii. Whether the accountholder, party to the arrangement or recipient of the service was treated as a Politically Exposed Person or subject to any enhanced due diligence and if so, what was it;

iii. Whether any suspicious activity was identified with any applicable account, financial arrangement or service, and a description of any such suspicious activity; and,

iv. Whether any applicable account, financial arrangement or service has been discontinued during this period, and if so the reason for the discontinuation.

2. If [your bank] has not conducted such a review in the past 5 years, what efforts has [your bank] initiated to identify any activity between those individuals named on the U.S. Government's January 29, 2018 list of senior political figures or the "Oligarchs List" and any applicable account, financial arrangement or service associated with your institution, and what actions does [your bank] plan to undertake if such an individual and any applicable account, financial arrangement or service is identified?

Letter from Senators Jeanne Shaheen and Sheldon Whitehouse to Brian Moynihan, Chief

Executive Officer, Bank of America (Apr. 18, 2018) (footnotes omitted).[1]

71.     Upon information and belief, the Secretary's designation of Dr. Gapontsev as a Russian oligarch has caused customers and potential customers to believe they cannot deal with Dr. Gapontsev or IPG Photonics.  Such beliefs may be enhanced by pending legislation, such as the proposed Defending Elections from Threats by Establishing Redlines Act ("DETER"), H.R. 4884, 115th Congress, 2d Session, and the proposed Defending American Security from Kremlin Aggression Act ("DASKA"), S. 3336, 115th Congress, 2d Session.  Each includes provisions regarding the imposition of sanctions on Russian oligarchs.

## **CLAIMS FOR RELIEF**

### **COUNT I**

### **(Violation of the Countering America's Adversaries Through Sanctions Act:  The Secretary of Treasury's Actions in Designating Dr. Gapontsev as a Russian Oligarch Violated CAATSA)**

72.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

73.     The Secretary's designation of Dr. Gapontsev as a Russian oligarch is not in accordance with a congressional statute, the CAATSA, which required the Secretary to determine Russian oligarchs by "their closeness to the Russian regime."  Any analysis of Dr. Gapontsev's closeness to the Russian regime would have disqualified him as a Russian oligarch.

74.     Moreover, Dr. Gapontsev's inclusion as an "oligarch in the Russian Federation" is contrary to the plain meaning of that term, which clearly refers to friends of

---

[1] Although this citation is to the Bank of America letter specifically, letters were drafted to several other major banking institutions, *e.g.*, JP Morgan Chase, Citibank, Barclays, Deutsche Bank, UBS, HSBC, and Credit Suisse.

powerful Russian officials who have been granted public assets by the Russian regime. Any analysis of the source of Dr. Gapontsev's wealth would have demonstrated that it arose from his groundbreaking inventions in the field of fiber lasers and contracts with Western firms, not favors from the Russian government or any of its officials.

75.    Further, the Secretary's public List of Oligarchs does not reflect the consultation the Secretary was required to have with intelligence officials and the Secretary of State.  The Secretary's public List of Oligarchs also does not reflect any   analysis of the factors the Secretary was required to consider under Section 241 of the CAATSA: a) "closeness to the Russian regime and [] net worth; b) the "relationship between individuals identified [by reference to the previous factor] and President Vladimir Putin or other members of the Russian ruling elite"; c) "any indices of corruption"; d) the "estimated net worth and known sources of the income of those individuals and their family members (including spouses, children, parents, and siblings), including assets, investments, other business interests, and relevant beneficial ownership information"; and e) "the non-Russian business affiliations of those individuals."  Instead, the Secretary's public List of Oligarchs appears to be a wholesale adoption of the *Forbes* Magazine March 28, 2017 list of Russian billionaires.

76.    Moreover, the Secretary violated CAATSA by failing to put the required statutory analysis in "the report," which was required to be submitted in unclassified form. To the extent that the Secretary conducted the statutorily required analysis in a classified annex, the Secretary violated CAATSA by including none of that analysis in the unclassified report.  That the analysis was required to be unclassified is a crucial protection for oligarch designees, so that the public could examine the reasons for the designation and the likelihood of further adverse action.  In his current split of information between unclassified report and

classified annex, the Secretary has published a disparaging designation of Dr. Gapontsev for the world to see but made secret all the analysis that may exonerate him.

77.     This Court should set aside and declare unlawful the Secretary's designation of Dr. Gapontsev as a Russian oligarch.

## COUNT II
### (Violation of the Administrative Procedure Act:
### The Secretary of the Department of Treasury's Action Designating Dr. Valentin Gapontsev as a Russian Oligarch Violated the Administrative Procedure Act)

78.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

79.     The Secretary's designation of Dr. Gapontsev as a Russian oligarch is "final agency action for which there is no other adequate remedy."   5 U.S.C. § 704.   The Secretary has informed Dr. Gapontsev and IPG Photonics that there is no administrative mechanism by which Dr. Gapontsev can be removed from Treasury's Section 241 List of Oligarchs.

80.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

81.     The Secretary's designation of Dr. Gapontsev as a Russian oligarch violates the APA as it is "arbitrary, capricious, an abuse of discretion, or  otherwise not in accordance  with law," 5  U.S.C.  §  706(2)(A); "contrary to constitutional right, power, privilege,  or  immunity," 5 U.S.C.  §  706(2)(B); "in  excess  of  statutory  jurisdiction, authority, or limitations," 5   U . S . C .   § 706(2)(C); and "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

82.     The Secretary's designation of Dr. Gapontsev as a Russian oligarch is not in accordance with a congressional statute, the CAATSA, which required the Secretary to determine Russian oligarchs by "their closeness to the Russian regime" and indices of

corruption.  Any analysis of Dr. Gapontsev's closeness to the Russian regime would have disqualified him as a Russian oligarch—as would the absence of any indices of corruption.

83.     Moreover, Dr. Gapontsev's inclusion as an "oligarch[] in the Russian Federation" is contrary to the plain meaning of that term, which clearly refers to friends of powerful Russian officials who have been granted public assets by the Russian regime. Any analysis of the source of Dr. Gapontsev's wealth would have demonstrated that it arose from his groundbreaking inventions in the field of fiber lasers and contracts with Western firms, not favors from the Russian government or any of its officials.

84.     Upon information and belief, the Secretary created his public List of Oligarchs based solely on net worth, and thereby cast a dark shadow over the named individuals, and then, in a classified report, conducted the real analysis of which individuals in fact are Russian oligarchs.  The public List of Oligarchs reflects no analysis of the factors set out in Section 241 of the CAATSA:   a) "closeness to the Russian regime and [] net worth; b) the "relationship between individuals identified [by reference to the previous factor] and President Vladimir Putin or other members of the Russian ruling elite"; c) "any indices of corruption"; d) the "estimated net worth and known sources of the income of those individuals and their family members (including spouses, children, parents, and siblings), including assets, investments, other business interests, and relevant beneficial ownership information"; and e) "the non-Russian business affiliations of those individuals." Instead, the Secretary made its oligarch designation by adopting the *Forbes* Magazine March 2017 list of Russian billionaires.  The Secretary's public List of Oligarchs also does not reflect any consultation with the Director of National Intelligence or the Secretary of State, as required by CAATSA.

85.     The Secretary also arbitrarily and capriciously classified all but the names

of the people designated as oligarchs.  By arbitrarily and capriciously pouring any analysis of the designees' sources of wealth, relationship with President Putin, or indicia of corruption into a classified annex, the Secretary arbitrarily and capriciously denied the public information about Dr. Gapontsev that would have mitigated the effect of the designation on Dr. Gapontsev and IPG Photonics.  Keeping secret the entirety of the analysis required by Section 241 of the CAATSA as to which individuals truly are Russian oligarchs is not in accordance with the terms of the statute, and certainly is not fair to Dr. Gapontsev, a U.S. citizen, or to IPG Photonics.  In these regards, the Secretary's designation was arbitrary and capricious and contrary to law.

86.    Further, in putting together the List of Oligarchs, the Secretary did not provide notice to Dr. Gapontsev or IPG Photonics that it was considering placing Dr. Gapontsev on the list; nor did the Secretary provide Dr. Gapontsev or IPG Photonics with an opportunity to present evidence prior to the Secretary's inclusion of Dr. Gapontsev on the Secretary's List of Oligarchs.

87.    The Secretary also has failed to provide any mechanism by which an individual included on the Secretary's List of Oligarchs can seek to be removed from the list.

88.    This Court should set aside and declare unlawful the Secretary's designation of Dr. Gapontsev as a Russian oligarch; the Court further should require that the Secretary provide notice and an opportunity to be heard, as well as procedures for seeking removal of any such designation, before making any future designation of Dr. Gapontsev or IPG Photonics.

**COUNT III**
**(The Secretary of Treasury's Actions Violated the Appointments Clause, the Constitutional Separation of Powers, and the Private Non-Delegation Doctrine)**

89.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

90.     The Appointments Clause of the United States Constitution, U.S. Const. Art. II, §2., Cl. 2, empowers the President to nominate and, with the advice and consent of the United States Senate, appoint public officials, including the Secretary of the Department of the Treasury.

91.     The Vesting Clause of Article II vests all the Executive Power in the President of the United States, subject to delegation by the President only to officers of the United States appointed in a manner consistent with the Constitution.  The Vesting Clauses of Articles I, II, and III of the United States Constitution vest the Executive, Legislative, and Judicial branches of government with separate and distinct powers.  U.S. Const. Art. I, § 1; U.S. Const. Art. II, § 1, Cl. 1; U.S. Const. Art. III, § 1.  The constitutionally distinct powers of the three branches of government, known as the separation of powers, provides a set of constitutional checks and balances on each branch of government.  The Appointments Clause requires every person exercising substantial government authority to have been appointed in one of two manners specified in that Clause.  Further, the Vesting and Appointments Clauses preclude a private entity from exercising the legislative, executive, or judicial powers of the Federal Government; this is known as the private Non-Delegation Doctrine.

92.     The Secretary's public List of Oligarchs does not reflect any of the analysis required of the Secretary by Section 241 of the CAATSA, including any analysis of the factors set out in Section 241.  The Secretary's public List of Oligarchs does not reflect any consultation with the Director of National Intelligence or the Secretary of State, as required

by CAATSA.  The Secretary's public List of Oligarchs also does not reflect any analysis of the factors set out by Congress in Section 241 of CAATSA: a) "closeness to the Russian regime and [] net worth; b) the "relationship between individuals identified [by reference to the previous factor] and President Vladimir Putin or other members of the Russian ruling elite"; c) "any indices of corruption"; d) the "estimated net worth and known sources of the income of those individuals and their family members (including spouses, children, parents, and siblings), including assets, investments, other business interests, and relevant beneficial ownership information"; and e) "the non-Russian business affiliations of those individuals." Instead, the Secretary's public List of Oligarchs simply mirrors the *Forbes* Magazine March 28, 2017 list of Russian billionaires.

93.     The Secretary's conduct improperly and unconstitutionally delegated the Secretary's power and authority to *Forbes* Magazine, a private entity owned by Hong Kong investors.  The Secretary's actions thereby violated the private Non-Delegation Doctrine. The Secretary's actions also violated the Appointments Clause, the Vesting Clauses, and the separation of powers principles in that the Secretary's actions caused Executive Branch functions to be performed by a person who was not an officer of the United States appointed in a manner permitted by the United States Constitution.

94.     This Court should set aside and declare unlawful the Secretary's  designation of Dr. Gapontsev as a Russian oligarch.

### COUNT IV
**(Violation of the Fifth Amendment to the U.S. Constitution:
The Secretary of Treasury's Actions in Designating Dr. Valentin Gapontsev as a
Russian Oligarch Has Violated Dr. Gapontsev's and IPG Photonics' Right to
Due Process)**

95.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

96.     The Due Process Clause of the Fifth Amendment requires that no person or

entity be deprived of his or its property or of a liberty interest without due process of law.

97.    In putting together the List of Oligarchs, the Secretary did not provide notice to Dr. Gapontsev or IPG Photonics that the Secretary was considering placing Dr. Gapontsev on the list; nor did the Secretary provide Dr. Gapontsev or IPG Photonics with an opportunity to present evidence prior to the Secretary's inclusion of Dr. Gapontsev on the Secretary's List of Oligarchs.

98.    The Secretary also has failed to provide any mechanism by which an individual included on the Secretary's List of Oligarchs can seek to be removed from the list.

99.    The Secretary's designation of Dr. Gapontsev as a Russian oligarch has resulted in harm both to Dr. Gapontsev and to IPG Photonics.  Because of the Secretary's designation, there is a black cloud over Dr. Gapontsev and IPG Photonics.  The company has had to expend resources to counteract the black cloud.  Dr. Gapontsev and IPG Photonics fear that the Secretary's designation has resulted and could result in a loss of business, including U.S. Government-related business.

100.    Plaintiffs are entitled to a declaration that the Secretary's designation of Dr. Gapontsev as a Russian oligarch violates the Fifth Amendment to the U.S. Constitution and should be set aside; the Court further should require that the Secretary provide notice and an opportunity to be heard, as well as procedures for seeking removal of any such designation, before making any future designation of Dr. Gapontsev or IPG Photonics.

**COUNT V**
**(Violation of the Privacy Act, 5 U.S.C. § 552a:**
**The Secretary's Designation of Dr. Valentin Gapontsev as a Russian Oligarch Violates**
**the Privacy Act)**

101.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

102.    The Secretary's Section 241 Report constitutes a "record" under the Privacy Act.

103.    The Secretary's inclusion of Dr. Gapontsev on the List of Oligarchs was in error and was due to the Secretary's knowing and intentional decision effectively to simply cut and paste the *Forbes* March 28, 2017 list of Russian billionaires.  The Secretary's public list does not reflect the Secretary's performance of his duties in accordance with CAATSA or by the means necessary to assure the fairness of his determination and of any determination made in reliance thereon.

104.    Dr. Gapontsev and IPG Photonics have sought to have Dr. Gapontsev's name removed from the Secretary's List of Oligarchs, but the Secretary has denied the request and further has stated that there is no mechanism by which an individual may seek to be removed from the List of Oligarchs.

105.    Dr. Gapontsev and IPG Photonics have been injured by the Secretary's erroneous inclusion of Dr. Gapontsev on the Section 241 List of Oligarchs.

106.    This Court should set aside and declare unlawful the Secretary's designation of Dr. Gapontsev as a Russian oligarch.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs request that the Court enter judgment in its favor and:

a.    Enter an Order holding unlawful and setting aside the Secretary's designation of Dr. Gapontsev as a Russian oligarch, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, limitations or short of statutory right; and without observance of procedure required by law.

b.    Enter an Order that the Secretary remove Dr. Gapontsev's name from the Secretary's List of Oligarchs appended to the Treasury's Section 241 Report.

c.    Enter an Order enjoining the Secretary to provide Dr. Gapontsev and IPG Photonics the opportunity to be heard and to present evidence before the Secretary makes any

future Russian oligarch, or other, designation of Dr. Gapontsev or IPG Photonics.

d.  Award Plaintiffs their litigation costs and reasonable attorneys' fees.

e.  Order such other relief as the Court may deem just and proper.

Dated: December 3, 2018                        Respectfully submitted,

                                               /s/ Michael J. Edney
                                               Michael J. Edney, DC Bar No. 492024
                                               Stephen M. McNabb, DC Bar No. 367102
                                               NORTON ROSE FULBRIGHT US LLP
                                               799 9th Street, NW, Suite 1000
                                               Washington, DC 20001-4501
                                               Telephone:  (202) 662-0200
                                               Fax:  (202) 662-4643
                                               michael.edney@nortonrosefulbright.com
                                               stephen.mcnabb@nortonrosefulbright.com

                                               *Attorneys for Plaintiffs Dr. Valentin
                                               Gapontsev and IPG Photonics Corporation*