## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. VALENTIN GAPONTSEV and IPG
PHOTONICS CORP.,

               Plaintiffs,

       v.

U.S. DEPARTMENT OF THE TREASURY
and STEVEN MNUCHIN, in his official
capacity as Secretary of the Treasury,

             Defendants.

Civil Docket No. 1:18-cv-02826-RC

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.    Statutory Background ........................................................................................... 3

    II.   Procedural History ............................................................................................... 6

STANDARD OF REVIEW .................................................................................................. 7

ARGUMENT ....................................................................................................................... 8

    I.    All of Plaintiffs' Claims Fail and Should be Dismissed ........................................... 8

        A.    The Sufficiency of the CAATSA Report Submitted to Congress is Not
             Justiciable ................................................................................................... 8

             i.    Congress—Not Plaintiffs—Decide the Adequacy of the CAATSA
                 Report .......................................................................................... 8

             ii.   *Plaintiffs' Lack Standing to Challenge the CAATSA Report* ................ 10

        B.    Plaintiffs Lack a Cause of Action for their Freestanding CAATSA Claim,
             and that Claim Fails on the Merits in Any Event ........................................... 11

             i.    *CAATSA Contains No Private Cause of Action* ..................................... 11

             ii.   *Plaintiffs' Freestanding CAATSA Claim Fails on the Merits* ............... 12

        C.    Plaintiffs' APA Claim is Not Actionable and Lacks Merit ........................... 18

             i.    *Treasury's Report Does Not Constitute Final Agency Action for
                 Purposes of the APA* ............................................................................ 18

             ii.   *Alternatively, Plaintiffs' APA Claim Should Be Rejected on Its
                 Merits* .................................................................................................... 20

        D.    The Secretary Neither Vested Any Executive Authority in, Nor Delegated
             Any Executive Authority to, *Forbes* Magazine ............................................. 21

        E.    Treasury Did Not Violate Any Constitutionally Cognizable Procedural
             Due Process Interest ................................................................................... 26

             i.    *Alleged Reputational Harms Are Not Cognizable Under the Due
                 Process Clause* ..................................................................................... 26

             ii.   *Plaintiffs Fail to Establish Any Stigma-Plus Due Process Claim* ......... 28

        *iii.*   *Plaintiffs' Case Law Is Inapposite* ........................................................... 32

   F.   Plaintiffs State No Violation of the Privacy Act ............................................... 33

II.   Plaintiffs Make No Clear Showing that They Are Entitled to the Extraordinary and Drastic Remedy of a Preliminary Injunction ..................................................... 38

   A.   Plaintiffs Have Not Shown That They Will Incur Irreparable Harm Absent A Preliminary Injunction ................................................................................ 39

   B.   The Balance of Equities Favor Treasury ......................................................... 43

CONCLUSION ................................................................................................................... 45

## **TABLE OF AUTHORITIES**

**Cases**                                                                                  **Page(s)**

*AARP v. EEOC*,
  226 F. Supp. 3d 7 (D.D.C. 2016)  ................................................................. 43

*\*Air Transport Ass'n. of Am., Inc. v. Export-Import Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ............................................................. 40, 41

*Akl v. Sebelius*,
  No. CV 08-0461 (RBW), 2012 WL 12905168 (D.D.C. Sept. 7, 2012) .......................... 36, 38

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ............................................................................. 11, 12

*Am. Civil Liberties Union Found. v. Wash. Metro. Area Transit Auth.*,
  303 F. Supp. 3d 11 (D.D.C. 2018) ................................................................ 39-40

*Am. Fed'n of Gov't Emps. v. Hawley*,
  543 F. Supp. 2d 44 & n.8 (D.D.C. 2008) ......................................................... 33-34, 35

*Am. Forest Res. Council v. Hall*,
  533 F. Supp. 2d 84 (D.D.C. 2008) ............................................................... 19

*Ark. Dairy Coop. Ass'n v. Dep't of Agric.*,
  573 F.3d 815 (D.C. Cir. 2009) ................................................................... 39

*Arriva Med. LLC v. Dep't of Health & Human Servs.*,
  239 F. Supp. 3d 266 (D.D.C. 2017) .............................................................. 41-42

*Ashbourne v. Hansberry*,
  No. 12-CV-01153 (BAH), 2015 WL 11303198 (D.D.C. Nov. 24, 2015) ........................... 37

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. 7

*\*Ass'n of Am. R.R. v. U.S. Dep't of Transp.*,
  721 F.3d 666 (D.C. Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct.
  1225 (2015) ..................................................................................... 25, 26

*\*Ass'n of Am. R.R. U.S. Dep't of Transp.*,
  821 F.3d 36 (D.C. Cir. 2016) ................................................................... 22

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) ............................................................................. 27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................. 7

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................... 19

*Bristol-Myers Squibb Co. v. Shalala*,
923 F. Supp. 212 (D.D.C. 1996) ........................................................ 42

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................ 22, 24

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) ........................................................................... 25

*\*Chambers v. Dep't of Interior*,
568 F.3d 998 (D.C. Cir. 2009) ............................................... 34, 35, 36

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................................... 39

*Clinton v. Jones*,
520 U.S. 681 (1997) ........................................................................... 22

*Coal. For Common Sense in Gov't Procurement v. United States*,
576 F. Supp. 2d 162 (D.D.C. 2008) .................................................... 39

*Cobell v. Norton*,
391 F.3d 251 (D.C. Cir. 2004) ............................................................. 7

*Cohen v. United States*,
650 F.3d 717 (D.C. Cir. 2011) ........................................................... 18

*Coll. Sports Council v. Gov't Accountability Office*,
421 F. Supp. 2d 59 (D.D.C. 2006) ..................................................... 10

*Comm. in Solidarity with People of El Salvador v. Sessions*,
929 F.2d 742 (D.C. Cir. 1991) ........................................................... 41

*Crooks v. Mabus*,
845 F.3d 412 (D.C. Cir. 2016) ........................................................... 29

*Deters v. U.S. Parole Comm'n*,
85 F.3d 655 (D.C. Cir. 1996) ....................................................... 34, 36

*Doe v. Dep't of Justice*,
753 F.2d 1092 (D.C. Cir. 1985) ......................................................... 28

*Doe v. Rogers*,
139 F. Supp. 3d 120 (D.D.C. 2015) .................................................... 28

*Edmond v. United States*,
520 U.S. 651 (1997) ........................................................................... 22

*Elec. Privacy Info. Cntr. v. FTC*,
    844 F. Supp. 2d 98 (D.D.C. 2012) ................................................................. 38-39

*Ervin & Assocs., Inc. v. Dunlap*,
    33 F. Supp. 2d 1 (D.D.C. 1997) ...................................................................... 30

*Feinerman v. Bernardi*,
    558 F. Supp. 2d 36 (D.D.C. 2008) .................................................................. 40

*Fisheries Survival Fund v. Jewell*,
    236 F. Supp. 3d 332 (D.D.C. 2017) ................................................................ 43

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................................ 22

*Freytag v. Comm'r of Internal Revenue*,
    501 U.S. 868 (1991) ........................................................................................ 23

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
    232 F. Supp. 3d 53 (D.D.C. 2017) .................................................................. 44

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) .................................................................... 42-43

*Gen. Elec. Co. v. Jackson*,
    610 F.3d 110 (D.C. Cir. 2010) ...................................................... 27, 28, 31

*Greene v. McElroy*,
    360 U.S. 474 (1959) .................................................................................. 29, 31

*Haig v. Agee*,
    453 U.S. 280 (1981) ........................................................................................ 45

*In re Navy Chaplaincy*,
    534 F.3d 756 (D.C. Cir. 2008) .................................................................. 39, 43

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    933 F. Supp. 2d 58 (D.D.C. 2013) .................................................................. 40

*Johnson v. Interstate Mgmt. Co., LLC*,
    849 F.3d 1093 (D.C. Cir. 2017) ................................................................ 11, 12

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951) .................................................................................. 28, 33

*Joshi v. Nat'l Transp. Safety Bd.*,
    791 F.3d 8 (D.C. Cir. 2015) ............................................................................ 20

*Kartseva v. Dep't of State*,
    37 F.3d 1524 (D.C. Cir. 1994) .................................................................. 29, 30

*Kleiman v. Dep't of Energy,
  956 F.2d 335 (D.C. Cir. 1992) ........................................................ 36, 37

Landry v. FDIC,
  204 F.3d 1125 (D.C. Cir. 2000) ........................................................... 23

League of Women Voters of United States v. Newby,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................. 39

*Lee v. Geren,
  480 F. Supp. 2d 198 (D.D.C. 2007) .................................................... 35

Lexmark Int'l, Inc. v. Static Control Components, Inc.,
  572 U.S. 118 (2014) ............................................................................ 11

Liff v. Office of Inspector Gen. for Dep't of Labor,
  881 F.3d 912 (D.C. Cir. 2018) ............................................................ 34

Loving v. United States,
  517 U.S. 748 (1996) ............................................................................ 25

Lugo v. U.S. Dep't of Justice,
  214 F. Supp. 3d 32 (D.D.C. 2016) ...................................................... 35

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992) ...................................................................... 10, 11

Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,
  567 U.S. 209 (2012) ............................................................................ 18

McCready v. Nicholson,
  465 F.3d 1 (D.C. Cir. 2006) .......................................................... 34, 36

Mistretta v. United States,
  488 U.S. 361 (1989) ............................................................................ 24

*Mosrie v. Barry,
  718 F.2d 1151 (D.C. Cir. 1983) ...................................................... 27, 28

Nat. Resources Defense Council v. Lujan,
  768 F. Supp. 870 (D.D.C. 1991) ......................................................... 10

Nat'l Council of Resistance of Iran v. Dep't of State,
  251 F.3d 192 (D.C. Cir. 2001) ............................................................ 32

Nat'l Ass'n of Home Builders v. Norton,
  415 F.3d 8 (D.C. Cir. 2005) ................................................................ 19

Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.,
  534 F. Supp. 2d 16 (D.D.C. 2008) ...................................................... 44

*Nat'l Resources Def. Council v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988) ................................................................. 8, 9

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................. 42

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977) ................................................................. 24

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................. 43

*OAO Alfa Bank v. Center for Public Integrity,*
    387 F. Supp. 2d 20 (D.D.C. 2005) ................................................................. 15

*Old Dominion Dairy Prod., Inc. v. Sec'y of Def.,*
    631 F.2d 953 (D.C. Cir. 1980) ................................................................. 31

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC,*
    48 F. Supp. 3d 87 (D.D.C. 2014) ................................................................. 42

*O'Donnell v. Barry,*
    148 F.3d 1126 (D.C. Cir. 1998) ................................................................. 28

*Paul v. Davis,*
    424 U.S. 693 (1976) ................................................................. 27, 33

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
    613 F.3d 220 (D.C. Cir. 2010) ................................................................. 32, 33

*Pittston Co. v. United States,*
    368 F.3d 385 (4th Cir. 2004) ................................................................. 25

*Qualls v. Rumsfeld,*
    357 F. Supp. 2d 274 (D.D.C. 2005) ................................................................. 8

*Regan v. Wald,*
    468 U.S. 222 (1984) ................................................................. 45

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
    324 F.3d 726 (D.C. Cir. 2003) ................................................................. 19

*Renal Physicians Ass'n v. HHS,*
    489 F.3d 1267 (D.C. Cir. 2007) ................................................................. 11

*Rogers U.S. Dep't of Labor,*
    607 F. Supp. 697 (N.D. Cal. 1985) ................................................................. 37

*Savage v. Burwell,*
    No. 15-CV-00791 (CRC), 2016 WL 4132196 (D.D.C. Aug. 3, 2016) ................................................................. 7

*Save Jobs USA v. Dep't of Homeland Sec.*,
   105 F. Supp. 3d 108 (D.D.C. 2015) ............................................................ 40, 41

*Siegert v. Gilley*,
   500 U.S. 226 (1991) ................................................................................. 27

*Singh v. Carter*,
   No. 16-cv-399 (BAH), 2016 WL 2626844 (D.D.C. May 6, 2016) ......................... 7

*\*Taylor v. Resolution Trust Corp.*,
   56 F.3d 1497 (D.C. Cir. 1995) ................................................................... 29

*Trifax Corp. v. Dist. of Columbia*,
   No. 98-2824 (D.D.C. Nov. 2, 2001) ............................................................ 31

*Trifax Corp. v. District of Columbia*,
   314 F.3d 641 (D.C. Cir. 2003) ............................................................ 29, 30, 31

*Trudeau v. Fed. Trade Comm'n*,
   384 F. Supp. 2d 281 (D.D.C. 2005) ......................................................... 19, 42

*Tucker v. Comm'r of Internal Revenue*,
   676 F.3d 1129 (D.C. Cir. 2012) ................................................................. 23

*United States v. Germaine*,
   99 U.S. 508 (1878) ................................................................................. 23

*Whitaker v. Thompson*,
   248 F. Supp. 2d 1 (D.D.C. 2002) ............................................................... 43

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ................................................................................. 25

*\*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................... 7, 39, 41, 42

*Wisc. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................................... 39

## **Statutes**

5 U.S.C. § 552a ...................................................................................... 34, 36

5 U.S.C. § 702 ........................................................................................... 18

*\*5 U.S.C. § 704 ..................................................................................... 18, 19

22 U.S.C. § 9225(a) ...................................................................................... 3

22 U.S.C. § 9403(e) ...................................................................................... 3

22 U.S.C. § 9544 ..................................................................................................................... 3

*Countering America's Adversaries Through Sanctions Act,
Pub. L. No. 115-44, 131 Stat. 886 (2017) ...................................................................... *passim*

**Legislative Materials**

*Corruption: A Danger to Democracy in Europe and Eurasia: Hearing Before the H.R.
Subcomm. on Eur., Eurasia, and Emerging Threats of the Comm. on Foreign Affairs*,
114th Cong. 37 (2016) .....................................................................................................15, 16

H.R. 7182, 115th Cong. § 2 (2018)...........................................................................................14

Materials in Extension of Remarks, Recognizing Sir Raymond A. Long,
151 Cong. Rec. E176 (2005) .....................................................................................................15

**Administrative and Executive Materials**

31 C.F.R. § 501.807 ................................................................................................................ 32

31 C.F.R. § 1010.605 ....................................................................................................... 3, 4, 13

**Other Authorities**

*Dep't of Treasury, Office of Insp. Gen. Audit Report OIG-19-033, *Audit of the Office of
Terrorism and Financial Intelligence's Report on Section 241 of the Countering America's
Adversaries Through Sanctions Act* (Feb. 22, 2019),
https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%
20Testimonies/OIG-19-033.pdf ................................................................................... *passim*

U.S. Dep't of the Treasury, Resource Center, OFAC FAQs: General Questions,
https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx
#basic ........................................................................................................................................32

## **INTRODUCTION**

On August 2, 2017, Congress enacted and the President signed the Countering America's Adversaries Through Sanctions Act ("CAATSA"). Pub. L. No. 115-44, 131 Stat. 886 (2017). CAATSA aimed "[t]o provide congressional review and to counter aggression by the Governments of Iran, the Russian Federation, and North Korea." *Id.* To facilitate such congressional review, the statute required the submission of a number of reports from the Executive Branch on topics relating to Iran, Russia, and North Korea.

Section 241 of CAATSA mandated one such report. It required the Secretary of the Treasury to submit, within 180 days of enactment of CAATSA, a report regarding senior foreign political figures, oligarchs, and parastatal entities of the Russian Federation. In the report, the Secretary was to identify the most significant senior foreign political figures and oligarchs in Russia, and then provide information pertaining to those individuals on specified topics, such as an assessment of those individuals' relationship with President Vladimir Putin or other members of the Russian ruling elite. On January 29, 2018, Defendant United States Department of Treasury ("Treasury") timely delivered to Congress the report in unclassified form with a classified annex, consistent with the statute's reporting requirements. The public portion of the report explained that it was prepared exclusively in response to CAATSA, included an unclassified list of oligarchs, and expressly stated that it did not constitute a sanctions list. In compiling the oligarch list, Treasury identified Russian individuals who possessed an estimated net worth of $1 billion or more. The list contained the names of ninety-six persons, including Plaintiff Valentin Gapontsev. Dissatisfied with his inclusion on the list, Gapontsev and his company IPG Photonics sued and moved for a preliminary injunction to require that he be removed from the list. *See* ECF Nos. 1, 12.

But that motion should be denied and this action dismissed because each of Plaintiffs'
claims lacks merit.  As an initial matter, Plaintiffs challenge the sufficiency of Treasury's
response to Congress's request for information; but that is not justiciable, as the adequacy of that
response is for Congress to judge.  Moreover, Treasury made clear that inclusion on the list did
not carry legal consequences, and cautioned that the report should not be viewed as evidence of
improper or illegal behavior, and thus Plaintiffs cannot establish standing.  Even setting aside
these threshold bars to review, Plaintiffs' claims fail.  They lack a cause of action to bring their
freestanding claim brought under CAATSA.  Their claim under the Administrative Procedure
Act ("APA") must also be dismissed, as the action Plaintiffs contest—the provision of
information by Treasury to Congressional subcommittees for purposes of their own review—
does not constitute "final agency action" as required by the APA.  Plaintiffs' omnibus claim
alleging violations of the Vesting Clause, Appointments Clause, constitutional separation of
powers, and private non-delegation doctrine fails because, even accepting Plaintiffs' plausibly
pled allegations as true, no private party exercised any executive authority or significant
authority pursuant to CAATSA.  Their procedural due process claim is similarly meritless, as
they set forth no constitutionally cognizable liberty or property interest.  And finally, Plaintiffs
cannot demonstrate any violation of the Privacy Act—Plaintiff IPG Photonics cannot bring suit
under that Act, and Plaintiff Gapontsev fails to identify an adverse determination or any
inaccuracy in Treasury's report, let alone that such determination proximately caused by such
inaccuracy.

Likewise, Plaintiffs fail to carry their burden with respect to the remaining requirements
for the preliminary relief that they seek.  They have not shown that they will suffer irreparable
harm absent a preliminary injunction.  Indeed, they do not even identity an instance where a

customer actually refused to contract with them as a result of Treasury's report, or otherwise attempt to quantify their alleged harm.  Nor does the prospect of possible future congressional action suffice to show irreparable harm.  And the balance of equities and the public interest favor Treasury.  Congress directed Treasury to provide an informational report more than a year ago, and Treasury did so using objective criteria for its public list of oligarchs.  This Court should not disturb Congress and the agency's decisions here, particularly given that the report itself clearly explains that it does not represent any determination that the listed individuals meet the criteria for sanctions.

## **BACKGROUND**

### I.    **Statutory Background**

CAATSA imposes sanctions on the activities of three countries: Iran (Title I of the legislation), Russia (Title II), and North Korea (Title III).  It also requires the Executive Branch to submit reports to specified congressional committees on a variety of subject matters.  Topics for these reports range from the identities of individuals who materially contributed to Iran's ballistic missile program, media organizations controlled and funded by Russia, and operators of foreign ports that fail to enforce inspection regulations on cargo sent to or from North Korea, as required by applicable United Nations Security Council resolutions.  *See, e.g.*, CAATSA § 104(e) (codified as enacted at 22 U.S.C. § 9403(e)); *id.* § 255 (codified as enacted at 22 U.S.C. § 9544); *id.* § 314 (codified as enacted at 22 U.S.C. § 9225(a)).

Pertinent for this litigation, CAATSA directs the Secretary of the Treasury to provide a report to six congressional committees that identifies "the most significant senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth."  *Id.* § 241(a)(1)(A).  For the term "senior foreign political figure," CAATSA incorporates the definition set forth in 31 C.F.R. § 1010.605.  *See id.*

§ 241(c)(2).  Under that definition, a senior foreign political figure is, *inter alia*, a current or former senior official of a foreign government or foreign political party, or a current or former senior executive in a foreign government-owned commercial enterprise.  31 C.F.R. § 1010.605(p)(1)(i).  The definition further clarifies that senior officials and executives are limited to those who have or had substantial authority over policy, operations, or the use of government-owned resources.  *Id*. § 1010.605(p)(2).  In contrast to its incorporation of the definition for "senior foreign political figure," CAATSA neither sets forth nor incorporates any definition for the term "oligarch."

Under CAATSA, once the Secretary identifies the most significant senior foreign political figures and oligarchs in Russia, the Secretary is to (1) assess the relationship between those individuals and President Vladimir Putin or other members of the Russian ruling elite; (2) identify any indices of corruption with respect to those individuals; (3) estimate the net worth of, and known sources of income for, those individuals and their family members; and (4) identify non-Russian business affiliations of those individuals.  CAATSA §§ 241(a)(1)(B)-(E).  Congress required the Secretary to provide the report within 180 days of CAATSA's enactment, and that it be submitted "in an unclassified form, but [could] contain a classified annex."  *Id*. §§ 241(a), (b).

On January 29, 2018, Treasury delivered its report to Congress.  *See Report to Congress Pursuant to Section 241 of the CAATSA Regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities*, ECF No. 13-1 [hereinafter "CAATSA Report"].  In the unclassified portion of the report, Treasury set forth a list of senior foreign political figures and oligarchs in Russia.  Both lists were created, Treasury explained, by using "objective criteria related to individuals' official position in the case of senior political figures, or a net worth of $1 billion or more for oligarchs."  *Id*. at 1.  The list of senior foreign

4

political figures consists of "i) senior members of the Russian Presidential Administration; ii) members of the Russian Cabinet, Cabinet-rank ministers, and heads of other major executive agencies; [and] iii) other senior political leaders, including the leadership of the State Duma and Federation Council, other members of the Russian Security Council, and senior executives at state-owned enterprises." *Id*. As for the list of oligarchs, Treasury identified individuals with an estimated net worth of $1 billion or more according to public information, *id*., which included Gapontsev, *id.*at 7. As permitted by statute, Treasury also provided to Congress "a classified annex to this report" that provided "additional information required pursuant to Section 24l(a)(l)." *Id*. at 1. That annex "may include" additional individuals who hold a position below the senior foreign political figures listed in the unclassified portion of the report, as well as other individuals whose net worth falls below $1 billion. *Id*.

In the report itself, Treasury made explicitly clear that a person's inclusion on either list should not be taken as any indication that he or she is "involve[d] in malign activities." *Id*. at 2. The lists were prepared "exclusively in response to Section 241 of CAATSA." *Id*. They were not "sanctions list[s]," and thus, "the inclusion of individuals or entities in th[e] report, its appendices, or its annex does not and in no way should be interpreted to impose sanctions on those individuals or entities" or represent any "determination by any agency that any of those individuals or entities meet the criteria for designation" for sanctions. *Id*. To the contrary, a person's presence on the lists neither implies, nor gives rise to, nor creates any "restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons." *Id*.

After the report's release, Treasury's Office of Inspector General conducted an audit to determine the agency's "compli[ance] with reporting requirements stipulated in CAATSA section 241." Treasury, Office of Ins. Gen. Audit Report OIG-19-033, *Audit of the Office of*

*Terrorism and Financial Intelligence's Report on Section 241 of the Countering America's Adversaries Through Sanctions Act* (Feb. 22, 2019)*, at 1,*

https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-19-033.pdf (attached as Exhibit A) [hereinafter "Audit Report"].  In its February 22, 2019 Audit Report, the Office of Inspector General concluded that the CAATSA Report "complies with the requirements listed in" CAATSA § 241, and that the report's completion "represents a great undertaking among members of multiple agencies."  Audit Report at 1.[1]

## II.    Procedural History

On December 3, 2018, more than ten months after Treasury issued its report, Plaintiffs sued.  Compl., ECF No. 1.  Plaintiffs set forth five causes of action, alleging violations of (1) CAATSA; (2) the APA; (3) a combination of the Vesting Clause, Appointments Clause, constitutional separation of powers, and private non-delegation doctrine; (4) the Fifth Amendment guarantee of procedural due process; and (5) the Privacy Act.  *Id.* ¶¶ 72-106.  Two-and-a-half months later, Plaintiffs moved for a preliminary injunction, requesting that the Court order Treasury to remove Gapontsev from the CAATSA Report's list of Russian oligarchs.  Pls.' Mot. Prelim. Injunction, ECF No. 12.

---

[1] The audit also concluded that the response to CAATSA § 241(a)(3)—which is not at issue here and pertains to exposure of key U.S. economic sectors to Russian exposed persons and parastatal entities—met statutory requirements but could be more detailed and informative.  Audit Report at 1, 7.  According to the audit, the agency's prioritization of the other four CAATSA sections (including its response to Section 241(a)(1)) and a miscommunication left little time for a more detailed analysis for Section 241(a)(3).  *Id.* at 1-2.

**STANDARD OF REVIEW**

Plaintiffs bear the burden of establishing jurisdiction, and though their Complaint's factual allegations must be accepted as true, the Court "must give" those allegations "closer scrutiny when resolving a" a motion under Federal Rule of Civil Procedure 12(b)(1) "than would be required for a 12(b)(6) motion . . . because subject matter jurisdiction focuses on the Court's power to hear a claim." *Savage v. Burwell*, No. 15-CV-00791 (CRC), 2016 WL 4132196, at *2 (D.D.C. Aug. 3, 2016) (citations and internal quotations marks omitted).

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court must accept as true all factual allegations in the complaint, that tenant is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The preliminary injunctive relief Plaintiffs seek constitute an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As such, Plaintiffs must "by a clear showing, carr[y] the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004), and "establish that [they are] likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest," *Winter*, 555 U.S. at 20.[2] Further, where "the injunction sought would alter, rather than preserve, the status quo"— which Plaintiffs seek to do here by requiring Treasury edit an already-published report—the

---

[2] The "continued viability of" the "sliding scale" approach the D.C. Circuit has used in the past "is highly questionable . . . in light of" *Winter*. *Singh v. Carter*, No. 16-cv-399 (BAH), 2016 WL 2626844, at *3 (D.D.C. May 6, 2016). Regardless, Plaintiffs fail to carry their burden here.

plaintiff must meet an even higher standard: he must demonstrate "a clear entitlement to relief"

or that "extreme or very serious damage will result if the injunction does not issue." *Qualls v.*

*Rumsfeld*, 357 F. Supp. 2d 274, 279 (D.D.C. 2005).

## ARGUMENT

### I.      All of Plaintiffs' Claims Fail and Should be Dismissed

Plaintiffs' Complaint sets forth five claims for relief, which their motion for preliminary

injunction largely tracks.  But each fails.  Accordingly, the Court should deny Plaintiffs' motion

and dismiss this case.

####      A.      The Sufficiency of the CAATSA Report Submitted to Congress is Not Justiciable

Plaintiffs' claims hinge on their view that Gapontsev should not be considered a Russian

"oligarch" as they would have the term defined, and thus Treasury should not have included him

in the CAATSA Report's unclassified list of such figures.  Their claims fail for two threshold

reasons.  First, Plaintiffs challenge the adequacy of the CAATSA Report, but that determination

belongs to Congress.  And second, the CAATSA Report explains that inclusion on the

unclassified oligarch list does not carry legal consequences, nor should be viewed as evidence of

improper or illegal behavior; accordingly, Plaintiffs cannot establish standing to press their

claims.

#####           i.      *Congress—Not Plaintiffs—Decide the Adequacy of the CAATSA Report*

Because Treasury submitted the oligarch list (as well as the remainder of the unclassified

report and its classified annex) to Congress in response to Congress's demand for such

information, *see* CAATSA § 241(a), (b), Plaintiffs' various challenges to the sufficiency of the

CAATSA Report are not reviewable here.  Courts have repeatedly held that Congressional

reporting requirements are "committed to *congressional* discretion in measuring the fidelity of

the Executive Branch action to legislatively mandated requirements." *Nat'l Resources Def. Council v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988). In *Hodel*, an appropriations act required an agency to report to Congress "in detail" why the agency declined to accept particular leasing proposals, and plaintiffs argued that the agency had not provided sufficient explanation in its statement to Congress. *Id.* at 316. The D.C. Circuit rejected this claim, concluding that such reporting provisions are not subject to the "general presumption of reviewability of agency action," "most importantly" because such executive responses are "an entirely different sort of agency action" than normal agency action, *i.e.*, where the agency has exercised its delegated powers. *Id.* at 318. Under these circumstances, "the Executive Branch officer is simply reporting back to the source of its delegated power [i.e. Congress]," and thus Congress—not courts—is charged with ensuring the adequacy of that report. *Id.* at 318-19 ("In short, in the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships.").

Same with CAATSA. Plaintiffs are dissatisfied that Gapontsev was listed as an oligarch, but Congress has broad discretion to request informational reports, even if such reports may cast some in an unflattering light. Here, Congress directed Treasury to provide it certain types of information, *see* CAATSA § 241(a), and in a certain way, *i.e.*, "in an unclassified form, but may contain a classified annex," CAATSA § 241(b). Treasury provided what was requested, and Plaintiffs cannot now interfere by suing over various grievances that they have with Treasury's response to Congress—such as allegedly failing to use the correct definition of "oligarch," Compl. ¶ 74, not applying purportedly required factors to craft the oligarch list, *id.* ¶ 82, and criticizing "the Secretary's allocation of analysis between the public report and classified annex,"

Mot. at 18.  The adequacy of those determinations are for Congress—not Plaintiffs—to decide.

*See, e.g.*, *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 68 (D.D.C.

2006) (rejecting APA claim alleging deficiencies and misstatements in report to Congress,

explaining that "[w]here a report is 'not explicitly or implicitly intended as anything more than a

vehicle to inform Congress,' it is for Congress alone to 'determine if the Report satisfies the

statutory requirements it enacted.'") (quoting *Nat. Resources Defense Council v. Lujan*, 768 F.

Supp. 870, 882 (D.D.C. 1991)).  All of Plaintiffs' claims fundamentally challenge the adequacy

of the CAATSA Report.  But the sufficiency of Treasury's response is not justiciable, and

Plaintiffs cannot challenge it here.  Their claims that attempt to do so should therefore be

dismissed.

ii.     *Plaintiffs' Lack Standing to Challenge the CAATSA Report*

Moreover, Plaintiffs have not carried their burden to show "the irreducible constitutional

minimum of standing," which requires an "injury in fact," that is "fairly traceable to the

challenged action of the defendant," and "likely" to "be redressed by a favorable decision."

*Lujan v. Defenders of* Wildlife, 504 U.S. 555, 560-61 (1992).  Here, Treasury caveated the

report, stating that a person's inclusion in the list of oligarchs neither carries any legal

consequences for the individual, nor should be taken as evidence that he or she has engaged in

any improper or illegal behavior.  *See* CAATSA Report at 2 (explaining that inclusion on the list

is not indicative of involvement "in malign activities," "does not, in and of itself, imply, give rise

to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by

either U.S. or foreign persons," and "does not constitute the determination by any agency that

any of those individuals or entities meet the criteria for designation under any sanctions

program").  Nevertheless, Plaintiffs claim injuries that stem from third parties' misunderstanding

or disregarding Treasury's clear statements in the CAATSA Report, *see* Compl. ¶¶ 66-71, such

10

as customers who purportedly believe "they cannot deal with Dr. Gapontsev or OPG Photonics," *id.* ¶ 71, or allegedly need to be "convince[d] . . . that they may still legally do business," *id.* ¶ 68.

But where, as here, standing "depends on the unfettered choices made by independent actors," it is "ordinarily substantially more difficult to establish," *Lujan*, 504 U.S. at 562, and Plaintiffs have not done so.  They have not shown that a favorable ruling that removes Gapontsev from the CAATSA Report—which was provided to Congress more than a year ago— would suddenly cause third parties to reevaluate and correct their purported misapprehensions. *See Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1274 (D.C. Cir. 2007) ("[S]tanding to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling.").

### B. Plaintiffs Lack a Cause of Action for their Freestanding CAATSA Claim, and that Claim Fails on the Merits in Any Event

#### i. CAATSA Contains No Private Cause of Action

Even setting aside these threshold bars to review, Plaintiffs still fail to state a claim. Plaintiffs allege that Treasury violated CAATSA, *see* Compl. ¶¶ 72-77, but that statute contains no private right of action.  "Like substantive law itself, private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  "If the text of a statute does not provide a cause of action, there ordinarily is no cause of action." *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1097 (D.C. Cir. 2017).  "[A] court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied . . . ."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).  The Supreme Court has, on "rare occasions," recognized the existence of an implied cause of action in a statute, but that requires a court to find that the statute "demonstrate[s] Congress's intent—

notwithstanding the lack of an express cause of action—to create a 'private right' and a 'private remedy.'"  *Johnson,* 849 F.3d at 1097 (quoting *Alexander*, 532 U.S. at 286).  This is "a high bar to clear," especially as the Supreme Court has, since 1975, "been very hostile to implied causes of action."  *Id*. at 1097-98.

Lacking a private cause of action under CAATSA, Plaintiffs' first claim must be dismissed.  Nowhere in the statute did Congress create any cause of action—much less any private right to sue or any private remedy that would be available upon suit—that would permit an individual to litigate an alleged violation of CAATSA.  Though Plaintiffs aver in their Complaint that their claim "arise[s] under . . . the CAATSA," Compl. ¶ 10, they do not identify any portion of the statute that authorizes judicial review—expressly or otherwise.  And though Plaintiffs allege in their motion that Treasury's actions "violate CAATSA," Mem. in Supp. of Pls.' Mot. for a Prelim. Injunction ("Mot.") at 14, ECF No. 12-1, they seemingly back away from asserting a freestanding CAATSA claim, arguing that the purported violation runs afoul of the APA, *see id.*  That APA claim should be dismissed, as detailed below, and so too should their freestanding CAATSA claim.

## ii. *Plaintiffs' Freestanding CAATSA Claim Fails on the Merits*

Plaintiffs' freestanding CAATSA claim fares no better on the merits.  Indeed, that claim is at odds with the determination from Treasury's Office of Inspector General that the agency complied with CAATSA § 241.  Audit Report at 7.  Nevertheless, Plaintiffs argue that the criterion used by Treasury to identify individuals for inclusion on its list of Russian oligarchs— those individuals' net worth—failed to comport with CAATSA because the statute also obligates Treasury to consider individuals' "closeness to the Russian regime."  Compl. ¶ 73; *see also* Mot. at 10 (same).

But CAATSA contains no such mandate.  Section 241(a)(1)(A) instructs Treasury to identify two sets of Russian individuals for purposes of its report: "the most significant senior foreign political figures" and "oligarchs."  Those lists are to be compiled based on two criteria: "closeness to the Russian regime" and "net worth."  CAATSA § 241(a)(1)(A).  The statute does not require that *both* criteria be used to determine *both* lists of individuals, and a reasonable interpretation of the statute calls for using the first criteria to determine the first list of individuals (*i.e.,* closeness to the Russian regime in determining the most significant senior foreign political figures) and the second criteria to determine the second list of individuals (*i.e.,* net worth in identifying oligarchs).  The Audit Report illustrates the reasonableness of such approach— drawing on public information "to assemble a list of wealthy Russians and senior political figures . . . would further distinguish this from a sanctions list and make clear that inclusion on the list does not imply Treasury is considering future action against these individuals," whereas a list mirroring the one in the classified report may telegraph potential targets for future sanctions, and risk "asset flight, offering individuals on the list an opportunity to move and conceal assets." Audit Report at 5-6.

Further weighing against Plaintiffs' interpretation, CAATSA incorporated the definition of "senior foreign political figure" found at 31 C.F.R. § 1010.605.  *See* CAATSA § 241(c)(2). That regulation defines senior foreign political figures as individuals who possess or possessed "substantial authority over policy, operations, or the use of government-owned resources" while in a (1) foreign government's executive, legislative, administrative, military, or judicial branch; (2) major foreign political party; or (3) foreign government-owned commercial enterprise.[3]  31

---

[3] The definition also includes immediate family members and "widely and publicly known" close associates of those individuals, as well as corporations, businesses, or other entities formed by, or for the benefit of, them.  *See* 31 C.F.R. § 1010.605(p)(1).

C.F.R. § 1010.605(p).  This definition focuses on an individual's authority and position, not

one's net worth.  And because CAATSA directs Treasury to identify not just "[s]enior foreign

political figures," but rather "*the most significant* senior foreign political figures," CAATSA §

241(a)(1)(A) (emphasis added), the statute is reasonably interpreted to require consideration of

only an individual's "closeness to the Russian regime" in making those determinations, as that

factor sheds light on both the authority and position held by the individual in question.  In

contrast, the "net worth" criterion bears no relevance to the definition for "senior foreign

political figure" incorporated by CAATSA, and thus that criterion is reasonably interpreted to

only have applicability for determining whether an individual should be identified as an oligarch.

Indeed, Plaintiffs even acknowledge the relevance of "net worth" in determining oligarch status.

*See*, *e.g.*, Mot. at 14 (oligarchs are those who "benefitted lavishly in the dissolution of the Soviet

Union").

Had Congress demanded that Treasury consider "closeness to the Russian regime" when

identifying a list of oligarchs, it would have expressly said so.  For example, the Stop Corrupt

Iranian Oligarchs and Entities Act ("SCIOE") was introduced in the House of Representatives on

November 28, 2018.  *See* H.R. 7182, 115th Cong. § 2 (2018).  Like CAATSA, it would require

Treasury to identify in a report for Congress "the most significant senior foreign political figures

and oligarchs in Iran."  *Id*. § 2(a)(1)(A).  But unlike CAATSA, the SCIOE expressly states that

"the most significant senior foreign political figures and oligarchs in Iran" would be "determined

by the closeness to the Iranian Government of *each such figure and oligarch*, and the estimated

net worth of *each such figure and oligarch*."  *Id*. (emphasis added).  This change in language

tacitly acknowledges that CAATSA did not adopt such an approach, and at a minimum, confirms

the reasonableness of that interpretation.

Nevertheless, Plaintiffs assert that Treasury's "action is inconsistent" with the "common sense, plain meaning of 'oligarch of the Russian Federation.'" Mot. at 15; *see also* Compl. ¶ 74 (similar). Plaintiffs go on to suggest a bevy of "common sense, plain meaning" definitions for the term "oligarch," as used in CAATSA, such as "friends of powerful Russian officials who have been granted public assets by the Russian regime," or "the few friends of Vladimir Putin who benefitted lavishly in the dissolution of the Soviet Union, as public assets were dispensed to them for a pittance." Compl. ¶ 74; Mot. at 14.

CAATSA, however, neither sets forth nor incorporates *any* of Plaintiffs' definitions. And Plaintiffs' citations likewise establish no definition of "oligarch" for interpreting the statute. Nothing in *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 23 (D.D.C. 2005), suggests that the district court viewed itself as setting forth a governing definition of the term, much less one to be used in identifying Russian oligarchs in a statute that would be enacted more than a decade later. Likewise, neither of the cited statements from individual congressmen purport to establish any official definition of the term. *See Corruption: A Danger to Democracy in Europe and Eurasia: Hearing Before the H.R. Subcomm. on Eur., Eurasia, and Emerging Threats of the Comm. on Foreign Affairs*, 114th Cong. 37 (2016) (statement of Rep. Dana Rohrabacher, Chairman, H.R. Subcomm. on Eur., Eurasia, and Emerging Threats of the Comm. on Foreign Affairs) (questioning a presenter during a congressional hearing on corruption in Europe and Eurasia); 151 Cong. Rec. E176 (2005) (Rep. Marilyn Musgrave submits an article from *The Denver Post* by former-Rep. Bob Schaffer "detailing his experiences in the recent Ukrainian elections"). And though Plaintiffs repeatedly reference Gapontsev's U.S. citizenship, *e.g.*, Mot. at 2, 3, 6, 11, 14, 15, 19, 20, 21, 22, 29, 31, even they do not go so far as to claim that that U.S. citizens cannot be considered oligarchs under CAATSA, nor do they deny that he

continues to be a Russian citizen, *see* Compl. ¶¶ 13, 42.  Indeed, Rep. Rohrabacher earlier in his hearing alludes to a different definition of "oligarch" that apparently encompasses Gapontsev.  *See* 114th Cong. 36 ("We have oligarchs in the United States.  Many of them happen to be technology developers, okay, they came up with a new type of technology, they earned billions of dollars on it.").

Plaintiffs further err in suggesting that, in composing its list of oligarchs, Treasury was required to consider the topics listed at CAATSA §§ 241(a)(1)(B) through (E), such as "the relationship between [the] individuals . . . and President Vladimir Putin" and "indices of corruption."  Compl. ¶ 75; *see also* Mot. at 15.  Under CAATSA, these topics do not constitute criteria to be used when determining *whether* a person should be identified as an oligarch.  Rather, the statute requires Treasury to supply this information *after* it has identified the individuals who are to be included in its list of Russian oligarchs.  For example, the information at § 241(a)(1)(B) seeks "[a]n assessment of the relationship between individuals *identified under subparagraph (A)* and President Vladimir Putin." (emphasis added).  Similarly, in § 241(a)(1)(C), CAATSA requires information regarding "indices of corruption with respect to *those individuals*." (emphasis added).  Those provisions do not set forth criteria for determining whether an individual should be identified in the public report as an oligarch in the first place.  And Congress was wise to draft Section 241(a)(1) as they did, because providing an unclassified list of oligarchs that mirrors the classified annex "risked telegraphing to the world, as well as Russian oligarchs and senior political figures, potential targets for future sanctions" and "presented the risk of asset flight."  Audit Report at 5-6.

Similarly, Plaintiffs take issue with "the Secretary's allocation of analysis between the public report and classified annex," Mot. at 18, and argue that Treasury "violated CAATSA by

failing to put the required statutory analysis in 'the report,' which was required to be submitted in unclassified form," Compl. ¶ 76. But no portion of the statute micromanages Treasury's placement of particular information and analysis into specific parts of the report. CAATSA simply stipulates that "[t]he report . . . shall be submitted in an unclassified form, but may contain a classified annex." CAATSA § 241(b). It does not require that any particular topic, including the topics listed in § 241(a)(1)(B) through (E), be addressed in the unclassified portion of the report, as opposed to the classified annex. Congress remained silent on that point and left it to Treasury's judgment. And Treasury took a reasonable approach given that "the majority of the information developed in response to section 241 of CAATSA was deemed classified" and using the classified annex to "answer most section 241 reporting requirements" would "reduce the possibility of asset flight" from potential sanction targets. Audit Report at 5-6.[4]

Plaintiffs' last argument likewise finds no basis in CAATSA's text. Although they contend that Treasury's list of oligarchs "does not reflect the consultation the Secretary was required to have with intelligence officials and the Secretary of State," Compl. ¶ 75; *see also* Mot. at 17 (similar), CAATSA does not require Treasury to explain in its report how or which portions of the report reflect its consultation with such individuals. Indeed, CAATSA does not even require Treasury to engage in such consultation specifically in determining its list of Russian oligarchs. Rather, it requires only that Treasury consult with the Director of National

---

[4] Plaintiffs suggest that Treasury's approach "directly injures Plaintiffs" because onlookers do not have purportedly "critical information to determine whether Dr. Gapontsev was at meaningful risk of U.S. Government sanctions." Mot. at 18. But Treasury *expressly stated* in the CAATSA Report that "the inclusion of individuals or entities in this report . . . does not and in no way should be interpreted to impose sanctions on those individuals or entities," and that a person's presence on the list "does not constitute the determination by any agency that any of those individuals or entities meet the criteria for designation under any sanctions program." CAATSA Report at 2.

Intelligence and the Secretary of State *on the report itself. See* CAATSA § 241(a) (requiring that "the Secretary of the Treasury, in consultation with the Director of National Intelligence and the Secretary of State, . . . submit to the appropriate congressional committees a detailed report . . . ."). CAATSA is silent on, and thus leaves to Treasury's discretion, the question of whether and to what extent it consults with the Director of National Intelligence and the Secretary of State on any particular topic required for the report, including the list of Russian oligarchs. In any event, the Audit Report explains the "active[] collaborat[ion] with the Office of the Director of National Intelligence and other agencies to plan, scope, and collect information for section 241(a)(1)." Audit Report at 5; *see also id.* at 7 (explaining evidence of "substantial coordination and consultation with ODNI and State officials, as required").

Plaintiffs cannot show a CAATSA violation; their claim should be dismissed.

### C.      Plaintiffs' APA Claim is Not Actionable and Lacks Merit

#### i.      *Treasury's Report Does Not Constitute Final Agency Action for Purposes of the APA*

Plaintiffs likewise cannot state a claim under the APA. As an initial matter, Plaintiffs' requested relief under the APA appears duplicative of the relief they request under the Privacy Act; namely, Gapontsev's removal from the CAATSA Report. *See* Compl. Prayer for Relief. But if an "adequate remedy at law exists, equitable relief is not available under the APA." *Cohen v. United States*, 650 F.3d 717, 731 (D.C. Cir. 2011); 5 U.S.C. § 704. Nor have Plaintiffs explained how they can avail themselves on the APA's waiver of sovereign immunity, notwithstanding the apparently duplicative relief that they seek. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215-16 (2012) (explaining that 5 U.S.C. § 702 "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes," and that "when Congress has dealt in particularity with a claim and

[has] intended a specified remedy—and its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment").

In any event, Plaintiffs' APA claim fails because this Court's "authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'" *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (quoting 5 U.S.C. § 704)); *see also Am. Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 90 (D.D.C. 2008). "[T]wo conditions must be satisfied for agency action to be 'final.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process," and "second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-78 (internal quotation marks omitted). "[A]ctions that are 'purely advisory and in no way affected the legal rights of the relevant actors,' fall outside the definition of 'final agency action.'" *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 289 (D.D.C. 2005) (quoting *Bennett*, 520 U.S. at 178), *aff'd on other grounds*, 456 F.3d 178.

Because Treasury's identification of Gapontsev as a Russian oligarch in the CAATSA Report does not determine any rights or obligations, and "[n]o legal consequences flow from the agency's conduct," *Reliable Automatic Sprinkler*, 324 F.3d at 732, Plaintiffs' APA claim fails. CAATSA does not impose legal repercussions for those identified in Treasury's list, as Section 241 requires the provision of a report, and Treasury disclaims any such effects in the report itself. *See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 14 (D.C. Cir. 2005) ("An agency's past characterization of its own action, while not decisive, is entitled to respect in a finality analysis."). Although CAATSA did not require Treasury to explain the report to the public, Treasury expressly caveated the report, stating that a person's inclusion in the list of oligarchs

neither carries any legal consequences for the individual, nor should be taken as evidence that he

or she has engaged in any improper or illegal behavior: "the inclusion of individuals or entities in

this report, its appendices, or its classified annexes does not, in and of itself, imply, give rise to,

or create any other restrictions, prohibitions, or limitations on dealings with such persons by

either U.S. or foreign persons."  CAATSA Report at 2.  Moreover, the agency explained that the

list of oligarchs "is not a sanctions list . . . and in no way should be interpreted to impose

sanctions on those individuals" identified.  *Id*.  Inclusion on the list does not "constitute the

determination by any agency that any of those individuals . . . meet the criteria for designation

under any sanctions program."  *Id*.  Indeed, Treasury emphasized that a person's presence on the

list does not "indicate that the U.S. Government has information about the individual's

involvement in malign activities."[5]  *Id*.

Though Plaintiffs may believe that other extralegal consequences have flowed from

Gapontsev's inclusion in Treasury's list, such as "reputational harm, financial harm, emotional

harm, [or] informational harm," those are "practical consequences, not legal harms that can

transform the Report[] into a final agency [action]."  *Joshi v. Nat'l Transp. Safety Bd*., 791 F.3d

8, 11-12 (D.C. Cir. 2015).  Accordingly, Plaintiffs' APA claim should be dismissed.

*ii.*    *Alternatively, Plaintiffs' APA Claim Should Be Rejected on Its Merits*

Threshold issues aside, Plaintiffs' APA claim still fails on the merits.  Plaintiffs' APA

claim relies upon arguments from their CAATSA claim.  For example, Plaintiffs contend that

---

[5] Plaintiffs suggest that "legislation has been proposed that would impose severe economic sanctions on those designated as Russian oligarchs."  Mot. at 4.  But the passage of any such legislation is speculative at best, and the fact remains that CAATSA and Treasury's report neither determine any rights or obligations nor results in any legal consequences for those included on the list of Russian oligarchs at this time.  As a consequence, judicial review under the APA is not available.  In addition, were the prospect of further legislation a sufficient basis to find final agency action, it is difficult to tell what the stopping point of such claims would be.

Treasury's list of Russian oligarchs is arbitrary and capricious under the APA because (1) the agency failed to consider individuals' closeness to the Russian regime and any indices of corruption; (2) the identification of Gapontsev as an oligarch contravenes "the plain meaning of [the term 'oligarch']"; (3) the public portion of Treasury's report contains no analysis of the topics listed at § 241(a)(1)(B) through (E); and (4) Treasury improperly set forth certain aspects of its analysis in the classified annex to its report.  Compl. ¶¶ 82-85; *see also* Mot. at 14; *id.* at 17 ("The Secretary Arbitrarily and Capriciously Failed to Provide the Statutorily Required Analysis in the *Public* Report to Congress.").  These arguments lack merit for the reasons discussed above.  And though Plaintiffs' APA claim also apparently relies on their Due Process claim, *compare* Compl. ¶¶ 86-87, *with id.* ¶¶ 97-98, those due-process arguments likewise fail, s*ee infra* Part I.E.

### D. The Secretary Neither Vested Any Executive Authority in, Nor Delegated Any Executive Authority to, *Forbes* Magazine

Next, Plaintiffs allege that "the Secretary copied the *Forbes* list of Russian billionaires and published it as Appendix B to his Section 241 Report to Congress."  Mot. at 25; *see also* Compl. ¶ 92.  From there, Plaintiffs conclude that Treasury "improperly and unconstitutionally delegated the Secretary's power and authority to *Forbes* Magazine, a private entity," thereby "caus[ing] Executive Branch functions to be performed by a person who was not an officer of the United States appointed in a manner permitted by the United States Constitution."  Compl. ¶ 93; *see also* Mot. at 26 (similar).  Plaintiffs thus assert violations of the Vesting Clause, the Appointments Clause, constitutional separation of powers principles, and the private non-delegation doctrine.  Compl. ¶ 93; *see also* Mot. at 25-26.

This claim fails because Plaintiffs offer no evidence or allegations of fact on which to find that *Forbes* Magazine ever exercised either executive authority or significant authority

pursuant to the laws of the United States, or that it was ever delegated such authority—necessary predicates for the alleged constitutional violations listed above.  With regard to the Vesting Clause, Article II of the constitution "vest[s] . . . executive power in the President."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*., 561 U.S. 477, 496 (2010).  Because Article II "makes a single President responsible for the actions of the Executive Branch," the President "cannot delegate ultimate responsibility or the active obligation to supervise that goes with it." *Id*. at 496-97 (quoting *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (Breyer, J., concurring in judgment)).  Accordingly, the Appointments Clause "requires every 'Officer of the United States' exercising 'significant authority pursuant to the laws of the United States' to be appointed in a specific manner."[6]  *Ass'n of Am. R.R. v. U.S. Dep't of Transp.* ("*Ass'n of Am. R.R. II*"), 821 F.3d 19, 36 (D.C. Cir. 2016) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)).  Because "the Appointments Clause is concerned only with the appointment of officers, not nonofficers . . . [t]he question is whether the 'appointee exercis[es] significant authority pursuant to the laws of the United States.'"  *Id*. at 37; *see also Edmond v. United States*, 520 U.S. 651, 662 (1997) (noting that "[t]he exercise of significant authority pursuant to the laws of the United States marks . . . the line between officer and nonofficer") (internal quotation marks omitted).

Plaintiffs' filings makes clear that *Forbes* Magazine exercised no such executive or significant authority pursuant to CAATSA that would render it an officer.  Per Plaintiffs' own allegations, *Forbes*'s list of Russian billionaires is dated March 28, 2017.  Compl. ¶ 92; *see also* Mot. at 11.  But CAATSA, with its requirement that Treasury compile and provide a list of

---

[6] "The prescribed manner differs depending on the type of 'Officer' to be appointed."  *Ass'n of Am. R.R. II*, 821 F.3d at 36.  Whereas Principal Officers "are appointed by the President with the 'advice and consent of the Senate,'" Congress may vest the appointment of Inferior Officers "in 'the President alone, in the Courts of Law, or in the Heads of Department.'"  *Id*. (quoting *Edmond*, 520 U.S. at 660).

Russian oligarchs, would not be enacted until August 2, 2017—more than four months later. Thus, *Forbes* could not have been exercising any executive or significant authority pursuant to CAATSA when, months before the statute's enactment, it compiled its list.

At most, Treasury consulted *Forbes*' list when composing its list of Russian oligarchs. But the CAATSA Report acknowledges that Treasury used public information.  *See* CAATSA Report at 1.  And as the Audit Report explains, drawing on "the Forbes' ranking . . . would further distinguish this from a sanctions list and make clear that inclusion on the list does not imply Treasury is considering future action against these individuals," and Treasury opted to use this methodology "to reduce the possibility of asset flight."  Audit Report at 6.  Accordingly, it was Treasury—not *Forbes*—that exercised any significant authority under CAATSA,[7] as it simply utilized information previously made public by *Forbes* to compile the list of Russian oligarchs.  Treasury selected the benchmark of $1 billion in net worth for use in compiling its list of Russian oligarchs, chose whether to rely on only public information, chose which source, and wielded final decision-making authority over which persons would be ultimately included on the list.  Accordingly, Treasury violated neither the Vesting Clause nor the Appointments Clause.[8]

---

[7] It is not clear compiling the oligarch list even constitutes "significant authority."  "[T]he main criteria for drawing the line between inferior Officers and employees not covered by the [Appointments] [C]lause are (1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions." *Tucker v. Comm'r of Internal Revenue*, 676 F.3d 1129, 1133 (D.C. Cir. 2012).  Identifying an individual as a Russian oligarch in the CAATSA Report would not constitute a significant matter because the designation carries no legal consequences.  *See* CAATSA Report at 2.  In any event, the final two factors plainly weigh against *Forbes* exercising any significant authority—the magazine exercised no discretion or authority over the final composition of Treasury's list of oligarchs, as its list predated CAATSA by months Treasury's delivery of the report to Congress by nearly a year.

[8] Plaintiffs also have not demonstrated that *Forbes* constituted an officer for two additional reasons.  First, *Forbes* was not acting in an office "'established by Law' (the threshold trigger for the Appointments Clause) [with] the 'duties, salary, and means of appointment' . . . specified by

Regarding the constitutional separation of powers, that principle operates as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Mistretta v. United States*, 488 U.S. 361, 382 (1989) (quoting *Buckley*, 424 U.S. at 122). The question in a separation-of-powers claim, therefore, is whether a law or action "accrete[s] to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." *Id.*

Here, however, Plaintiffs do not allege any incursion by one branch of Government into the constitutional authority of another, but rather, the execution of "Executive Branch functions" by *Forbes* Magazine, an entity that was "not an officer of the United States appointed in a manner permitted by the United States Constitution." Compl. ¶ 93; *see also* Mot. at 3 (arguing that "constitutional separation of powers . . . require[s] that official government actions be taken by officers of the United States"). To the extent Plaintiffs are challenging an alleged execution of Executive Branch functions by a private party, such a claim is not cognizable under the constitutional separation of powers, which focuses on "disrupt[ions] [of] the proper balance between the coordinate branches [of Government]." *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 443 (1977*)*. To the extent Plaintiffs instead allege that the Executive Branch has usurped Congress's role under the Appointments Clause by vesting in itself the appointment of an inferior officer, that argument fails because *Forbes* Magazine never constituted an officer, as discussed above.

---

statute." *Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000) (quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991)). Second, even if *Forbes* was operating in an office established by law, Plaintiffs cannot show that its actions in that office "were continuing and permanent, not occasional or temporary." *United States v. Germaine*, 99 U.S. 508, 511-12 (1878).

Finally, the private non-delegation doctrine is "the lesser-known cousin of the doctrine

that Congress cannot delegate its legislative function to an agency of the Executive Branch,"

known as the non-delegation doctrine. *Ass'n of Am. R.R. v. U.S. Dep't of Transp*. ("*Ass'n of Am.*

*R.R. I*"), 721 F.3d 666, 670 (D.C. Cir. 2013), *vacated and remanded on other grounds Dep't of*

*Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015). "The fundamental precept of the

[non-]delegation doctrine is that the lawmaking function belongs to Congress and may not be

conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996)

(internal citation omitted). "In a delegation challenge, the constitutional question is whether the

statute has delegated legislative power to the agency." *Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 472 (2001).

As an outgrowth of that principle, the private non-delegation doctrine holds that

"[f]ederal lawmakers cannot delegate regulatory authority to a private entity," which would

constitute "'legislative delegation in its most obnoxious form.'" *Ass'n of Am. R.R. I*, 721 F.3d at

670 (quoting *Carter v. Carter Coal Co*., 298 U.S. 238, 311 (1936)). "Not every Congressional

delegation of authority to a private party is impermissible, however." *Pittston Co. v. United*

*States*, 368 F.3d 385, 394 (4th Cir. 2004). Indeed, the D.C. Circuit has affirmed that private

parties may participate in an "advisory or subordinate role in the regulatory process." *Ass'n of*

*Am. R.R. I*, 721 F.3d at 673. The question, then, is whether the entity's "advisory role" and

"involvement . . . in the administrative process" has "trespasse[d] into an unconstitutional

delegation." *Id*. at 671.

As discussed above, neither Congress nor Treasury delegated any regulatory authority to

*Forbes* Magazine. Again, Treasury selected the $1 billion benchmark, chose whether to rely on

only public information, chose which source, and wielded final decision-making authority over

who to ultimately include on the list.  Plaintiffs offer no allegation or evidence that *Forbes* had a

role in any of this.  At most, *Forbes* published a list of Russian individuals whose net worth

exceeded $1 billion, and Treasury consulted that list months later.  *See* CAATSA Report at 1;

Audit Report at 6.  That does not stray so far from an advisory or informational capacity as to

"trespass[] into an unconstitutional delegation."  *Ass'n of Am. R.R. I*, 721 F.3d at 671.

Thus, this Court should dismiss Plaintiffs' omnibus claim under the Vesting Clause,

Appointments Clause, constitutional separation of powers, and the private non-delegation

doctrine.

**E.     Treasury Did Not Violate Any Constitutionally Cognizable Procedural Due Process Interest**

*i.     Alleged Reputational Harms Are Not Cognizable Under the Due Process Clause*

Plaintiffs also fail to state a procedural due process claim.  In their Complaint, Plaintiffs

argue that the lack of notice provided to them prior to issuance of Treasury's report, and the

absence of any mechanism after issuance by which Gapontsev could have sought removal from

the list of oligarchs, violates the Fifth Amendment.  Compl. ¶¶ 97-98.  This alleged constitutional

violation, Plaintiffs contend, casts a "black cloud over Dr. Gapontsev and IPG Photonics."  *Id.*

¶ 99; *see also id.* ¶¶ 66-71 (describing how potential business partners allegedly "believe they

cannot deal with Dr. Gapontsev or IPG Photonics" following issuance of Treasury's report).

Plaintiff IPG Photonics has allegedly "had to expend resources to counteract the black cloud."

*Id.* ¶ 99; *see also id.* ¶¶ 68-69 (describing such efforts).  In spite of such efforts, Plaintiffs

allegedly "fear that the Secretary's designation has resulted and could result in a loss of business,

including U.S. Government-related business."  *Id.* ¶ 99; *see also* Mot. at 21.

Though such purported reactions by third-parties may misconstrue the import of the

list—especially given Treasury's explicit statement in its report that inclusion on the list of

oligarchs neither imposes any "restrictions, prohibitions, or limitations on dealings with such persons," nor "indicate[s] that the U.S. Government has information about the individual's involvement in malign activities," CAATSA Report at 2—such allegations do not establish a viable procedural due process claim.  "As the Supreme Court has repeatedly stated, 'the range of interests protected by procedural due process is not infinite.'"  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 119 (D.C. Cir. 2010) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972)).  Liberty and property interests cognizable under the Fifth Amendment "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law," and thus "the procedural guarantees of the [Fifth] Amendment apply whenever the State seeks to remove or significantly alter that protected status."  *Paul v. Davis*, 424 U.S. 693, 710-11 (1976).

A person's "interest in reputation," however, "is quite different from [such] 'liberty' or 'property' [interests]."  *Id*. at 711-12.  "[A]ny harm or injury to that [reputational] interest, even where . . . inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law, nor [does] it work[] any change of . . . status as theretofore recognized under the State's laws."  *Id*. at 712.  One's interest in one's own reputation, therefore, "is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law."  *Id*.

Courts have thus have long held that "stigma alone is insufficient to invoke due process protections."  *Gen. Elec*., 610 F.3d at 121; *see also Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (noting that its decision in *Paul v. Davis* "turn[ed] . . . on the lack of any constitutional protection for the interest in reputation").  This includes purported financial injuries that flow from reputational harm allegedly inflicted by the Government.  Harm to "business interests . . . cannot

qualify as a deprivation of liberty because it does not amount to a change in legal status."
*Mosrie v. Barry*, 718 F.2d 1151, 1162 (D.C. Cir. 1983).  This is because "[t]he reaction of others
to unfavorable publicity about a person" constitutes not a "change in legal status imposed by the
government officials who generated the publicity," but rather, "'sanctions applied by public
disapproval, not by law.'"  *Id.* (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S.
123, 184 (1951) (Jackson, J., concurring)).

      ii.    *Plaintiffs Fail to Establish Any Stigma-Plus Due Process Claim*

      To state a viable procedural due process claim on the basis of an alleged injury to one's
reputation, as Plaintiffs seemingly seek to do, *see* Compl. ¶ 99 (alleging "a black cloud over Dr.
Gapontsev and IPG Photonics"), a party must satisfy the "so-called stigma-plus rule," *Gen. Elec.*,
610 F.3d at 121.  "The stigma-plus theory stands for the proposition that certain government
actions (stigmas) that cause a change in the plaintiffs' status under the law (plus) and preclude a
plaintiff from being able to secure future employment opportunities may be actionable under the
Fifth Amendment."  *Doe v. Rogers*, 139 F. Supp. 3d 120, 159 (D.D.C. 2015).  The stigma-plus
rule requires a plaintiff to show, "in addition to reputational harm, that (1) the government has
deprived them of some benefit to which they have a legal right, *e.g.*, the 'right to be considered
for government contracts in common with all other persons'; or (2) the government-imposed
stigma is so severe that it 'broadly precludes' plaintiffs from pursuing 'a chosen trade or
business.'"[9] *Gen. Elec.*, 610 F.3d at 121 (quoting *Doe v. Dep't of Justice*, 753 F.2d 1092, 1108-

---

[9] A stigma-plus claim is distinct from a "reputation-plus" claim, which Plaintiffs cannot establish
in this case.  *See Doe*, 139 F. Supp. 3d at 159.  In a reputation-plus claim, a plaintiff "points to
the conjunction of official defamation and adverse employment action."  *Id.* (quoting *O'Donnell
v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998)).  Plaintiffs were "never employed by the
government" and so "the essential element[] of" that cause of action [is] lacking."  *Id.*

09 (D.C. Cir. 1985) and *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003)).

Plaintiffs' procedural due process claim falls into neither of these two narrow categories. In order to show a change in their status under the law pursuant to the first category, Plaintiffs must demonstrate that Treasury's "action formally or automatically excludes [Plaintiffs] from work on some category of future [government] contracts or from other government employment opportunities." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994). Gapontsev's inclusion on Treasury's list of Russian oligarchs results in no such formal or automatic exclusion from work on government contracts or employment opportunities. *See* CAATSA Report at 2 ("[I]nclusion of individuals or entities in this report, its appendices, or its classified annexes does not, in and of itself, imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons.").

To fall within the second category, Treasury's actions must "preclude[] [the plaintiff]— whether formally or informally—from such a broad range of opportunities that it interferes with [his] constitutionally protected right to follow a chosen trade or profession." *Crooks v. Mabus*, 845 F.3d 412, 421 (D.C. Cir. 2016) (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995)) (first alteration added). This is a high bar to surmount. Plaintiffs "claiming 'broad preclusion' must show that 'the government has seriously affected, if not destroyed, [their] ability to obtain employment [or contracts] in [their] field.'" *Taylor*, 56 F.3d at 1506 (alterations in original) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)). Only when the effective preclusion rises to this level can the Government's action be said to result in "'a tangible change in status,' as compared to a more general injury to reputation and the

consequent general dampening effect on employment opportunities." *Ervin & Assocs., Inc. v.*
*Dunlap*, 33 F. Supp. 2d 1, 10 (D.D.C. 1997) (quoting *Kartseva*, 37 F.3d at 1527).

This high bar is not met here.  In their supporting declarations, Plaintiffs state that they
have received questions from U.S. Government officials and contractors regarding Gapontsev's
inclusion on Treasury's list.  *See* Christensen Decl. ¶¶ 8-12, ECF No. 17 (describing questions
received).  But questions do not broadly preclude them from pursuing their chosen trade or
business.  And indeed, Plaintiffs suggest that they have been able to "field questions relating to
the Secretary's designation of Dr. Gapontsev and . . . convince customers that they still may
legally do business with IPG Photonics."  Compl. ¶ 68; *see also id.* ¶ 69 (Plaintiffs spent "time
and other assets to clarify[] the significance of the designation"); *id.* ¶ 99 (Plaintiffs "expend[ed]
resources to counteract the black cloud"); Mot. at 12-13 (noting that Plaintiffs "have been
required to . . . convince customers (and potential customers) that IPG Photonics still may legally
do business").  This demonstrates an ability by Plaintiffs to communicate with prospective
business partners and correct any potential misconceptions—an endeavor bolstered by the clear
language in Treasury's report that an individual's inclusion on the list imposes no "restrictions,
prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons."
CAATSA Report at 2.

Similarly, Plaintiffs cannot demonstrate that their ability to obtain contracts has been
"seriously affected, if not destroyed," *Trifax*, 314 F.3d at 644, by claiming that Gapontsev's
inclusion "has affected, or will affect, their business," that IPG Photonics harbors "concern[s]
that it has lost or may lose business opportunities," Compl. ¶¶ 66, 68; *see also* Mot. at 12-13, and
that others have incorrectly assumed that it "was disqualified from government subcontracting
work," or recommended "caution" when dealing with individuals included on Treasury's list of

Russian oligarchs, Mot. at 12.  Aside from lacking detail, these concerns, assumptions, and recommendations are a far cry from those rare occasions where courts have found "government-imposed stigma . . . so severe that it 'broadly precludes' plaintiffs from pursuing 'a chosen trade or business.'"  *Gen. Elec.*, 610 F.3d at 121 (quoting *Trifax*, 314 F.3d at 644); *cf. Greene*, 360 U.S. at 492 (alleged liberty interest sufficient where "revocation of security clearance caused petitioner to lose his job . . . and has seriously affected, if not destroyed, his ability to obtain employment in the aeronautics field"); *Old Dominion Dairy Prod., Inc. v. Sec'y of Def.*, 631 F.2d 953, 963-64 (D.C. Cir. 1980) (finding broad preclusion where a government contracting officer's determination that a prospective government contractor "lacked integrity" "would follow [the contractor] in any attempt to procure Government work" thus "effect[ively] foreclos[ing] [its] freedom to take advantage of other Government employment opportunities" and thus "effectively put[ting] [it] out of business").

Plaintiffs therefore have not experienced any de facto foreclosure of their ability to conduct business within their chosen field or profession.  While Plaintiffs claim that "IPG Photonics' deal flow from U.S. government contractors has slowed," Christensen Decl. ¶ 8, their evidence does not show that this is because of the CAATSA Report, *see id.*, and in any event, they do not claim that deals have stopped.  Indeed, they do not point to a single instance where a customer has refused to contract because of the CAATSA Report.  Where a party, like apparently Plaintiffs here, has "'won some and lost some'" in its efforts to generate business, the party "fail[s] to show anything remotely close to 'broad preclusion.'"[10]  *Trifax*, 314 F.3d at 644 (quoting *Trifax Corp. v. Dist. of Columbia*, No. 98-2824, mem. op. at 14 (D.D.C. Nov. 2, 2001)).

---

[10] Plaintiffs suggest they have been subject to "additional inquiries from [IPG Photonics'] banking facilities."  Compl. ¶ 70; *see also* Mot. at 13 but do not allege that those inquiries have broadly precluded them from conducting business within their chosen field or profession.

iii.     *Plaintiffs' Case Law Is Inapposite*

The cases Plaintiffs reply upon in their motion do not alter the equation.  The two cases

on which they primarily rely, *Nat'l Council of Resistance of Iran ("NCRI") v. Dep't of State*,

251 F.3d 192 (D.C. Cir. 2001) and *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613

F.3d 220 (D.C. Cir. 2010), both arise in the context of the Anti–Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  Under AEDPA, the Secretary of State has the authority to

designate an entity as a "foreign terrorist organization."[11]  *NCRI*, 251 F.3d at 196.  As described

by the D.C. Circuit, "[t]he consequences of that designation are dire."  *Id*.  It "results in blocking

any funds which the organization has on deposit with any financial institution in the United

States," "[r]epresentatives and certain members of the organization are barred from entry into the

United States," and persons who "'knowingly provid[e] material support or resources' to the

organization" are subject to criminal prosecution.  *Id*.; *see also People's Mojahedin Org. of Iran*,

613 F.3d at 223.

Given these consequences, the D.C. Circuit in *NCRI* found that the plaintiffs had set forth

a viable stigma-plus due process claim.  As a result of the Secretary's designation, the plaintiffs

"ha[d] suffered more than mere stigmatization."  *NCRI*, 251 F.3d at 204.  They had also "been

deprived of the previously held right to—for example—hold bank accounts, and to receive

material support or resources from anyone within the jurisdiction of the United States."  *Id*.  The

plaintiffs were thus able to allege both reputational harm and a change in their status under the

---

[11] Plaintiffs note that Treasury has a mechanism for challenging designations on the Specially
Designated Nationals and Blocked Persons ("SDN") List, set forth at 31 C.F.R. § 501.807.  Mot.
at 20.  But unlike the CAATSA Report's oligarch list, "U.S. persons are prohibited from dealing
with SDNs wherever they are located and all SDN assets are blocked."  U.S. Dep't of the
Treasury, Resource Center, OFAC FAQs: General Questions,
https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#basic.

law required for a stigma-plus claim.  *See id.* (noting the Supreme Court's holding in *Paul* that

"the appropriate rule of law is that where the government issues a stigmatizing posting (or

designation) as a result of which the stigmatized individual is 'deprived . . . of a right previously

held under state law,' due process is required" (quoting *Paul*, 424 U.S. at 708)); *accord People's*

*Mojahedin Org. of Iran*, 613 F.3d at 227-28 (applying *NCRI*).  As discussed above, Plaintiffs'

described circumstances bear no resemblance.

Plaintiffs' remaining case, *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S.

123 (1951)—a splintered decision with a two-Justice plurality opinion, four concurrences, and a

three-Justice dissent—does not stand for the proposition that "[t]he reputational harm of the

Government's formal designation of a U.S. citizen in such a pejorative category" is "enough to

require due process," as Plaintiffs incorrectly suggest.  Mot. at 22.  Indeed, the plurality opinion

does not mention due process at all, and instead held that, accepting as true at the Rule 12(b)(6)

stage the plaintiffs' descriptions of their own organizations (which, in any event, the defendant

Attorney General had not contested), there was no reasonable basis on which the Attorney

General could have designated them as Communist.  *Joint Anti-Fascist Refugee Comm.*, 341

U.S. at 126.    And even if the case could be construed to provide some margin of support for

Plaintiffs' proposition, it nonetheless predates *Paul* and the Supreme Court's admonition almost

twenty-five years later that a person's reputation "is neither 'liberty' nor 'property' guaranteed

against state deprivation without due process of law" absent some accompanying change in

status under the law.  *Paul*, 424 U.S. 711-12.

### F.    Plaintiffs State No Violation of the Privacy Act

Finally, Plaintiffs' Privacy Act claim should also be dismissed.  As an initial matter,

"only individuals have standing to bring Privacy Act claims," *Am. Fed'n of Gov't Emps. v.*

*Hawley*, 543 F. Supp. 2d 44, 49 & n.8 (D.D.C. 2008) ("*AFGE*") (collecting cases); *see also* 5

U.S.C. § 552a(a)(2) (defining "individual" to mean "a citizen of the United States or an alien

lawfully admitted for permanent residence"), and so this claim should be dismissed for lack of

jurisdiction insofar as its raised by IPG Photonics.

As applicable to Gapontsev, an individual may bring suit under the Privacy Act where an

agency

> fails to maintain any record concerning any individual with such accuracy,
> relevance, timeliness, and completeness as is necessary to assure fairness in any
> determination relating to the qualifications, character, rights, or opportunities of,
> or benefits to the individual that may be made on the basis of such record, and
> consequently a determination is made which is adverse to the individual.

§ 552a(g)(1)(C).[12]  This requires a plaintiff to show that "(1) [she] has been aggrieved by an

adverse determination; (2) the [agency] failed to maintain [her] records with the degree of

accuracy necessary to assure fairness in the determination; (3) the [agency's] reliance on the

inaccurate records was the proximate cause of the adverse determination."[13]  *McCready v.*

*Nicholson*, 465 F.3d 1, 10 (D.C. Cir. 2006) (quoting *Deters v. U.S. Parole Comm'n*, 85 F.3d 655,

657 (D.C. Cir. 1996)) (emphasis omitted) (alterations in original).  Even accepting, for purposes

of argument, that the CAATSA Report constitutes a "record" under the Privacy Act, Gapontsev

cannot satisfy any of these three requirements.

First, Gapontsev fails to establish that he has been actually aggrieved by any adverse

determination.  *See Chambers v. Dep't of Interior*, 568 F.3d 998, 1007 (D.C. Cir. 2009)

---

[12] Though the Complaint does not expressly state which part of the Privacy Act was allegedly
violated, *see* Compl. ¶¶ 101-106, Plaintiffs' preliminary injunction motion makes clear that they
bring their challenge under Section 552a(g)(1)(C), *see* Mot. at 22-23.  To the extent Plaintiffs try
to claim some other violation of the Privacy Act, such an argument would likewise fail.

[13] As Plaintiffs note, Mot. at 24, "[t]he Privacy Act also applies when an 'adverse determination
is made' by . . . an outside actor."  *Liff v. Office of Inspector Gen. for Dep't of Labor*, 881 F.3d
912, 923 (D.C. Cir. 2018).

("Central to a cause of action under subsection (g)(1)(C) is the existence of an adverse agency determination resulting from inaccurate agency records.").  Plaintiffs identify no instance in which any individual or entity refused to conduct business with Gapontsev, or otherwise rendered a determination adverse to him, much less on the basis of Treasury's report.  Rather, Gapontsev merely relies on questions that IPG Photonics received regarding his inclusion on Treasury's list, incorrect assumptions that he is disqualified from certain types of contacts as a result of his inclusion on Treasury's list, and congressional inquiries to third parties or otherwise being "red-flagged" for "extra diligence."  Mot. at 24; Christensen Decl. ¶¶ 8-13.

But such inquiries, assumptions, and recommendations for diligence do not constitute the type of "concrete, adverse determination[]" necessary "to state an adverse-determination claim," *Lee v. Geren*, 480 F. Supp. 2d 198, 210 (D.D.C. 2007)—especially where, as noted above, Plaintiffs have demonstrated an ability to field questions and correct misunderstandings.  Third-party reactions that negatively impact an individual's employment or business prospects do not suffice.  *See id.* (rejecting allegations that the agency's refusal to amend records adversely affected the plaintiff's "prospects for future employment" in the absence of "any corresponding concrete, adverse determinations").  Indeed, the D.C. Circuit in *Chambers* affirmed a district court's dismissal of a Privacy Act claim where the plaintiff merely alleged a "hamper[ing]" of her ability to apply for federal government jobs, requiring instead "an adverse action against her—such as rejecting her application outright or refusing to hire her."  568 F.3d at 1007 & n.6.  Gapontsev identifies no comparable adverse actions here.[14]

---

[14] Plaintiffs cite *AFGE*, 543 F. Supp. 2d at 52, to claim they suffered an adverse determination.  Mot. at 24.  But the plaintiffs there brought suit under § 552a(g)(1)(D) of the Privacy Act, "which creates a catch-all cause of action against an agency for any Privacy Act violation, provided the violation caused the plaintiff an 'adverse effect.'"  *Lugo v. U.S. Dep't of Justice*, 214 F. Supp. 3d 32, 38 (D.D.C. 2016); *see also AFGE*, 543 F. Supp. 2d at 49.  Gapontsev,

Gapontsev also worries that third-parties might make determinations adverse to IPG Photonics' business. *See, e.g.*, Compl. ¶ 68 ("IPG Photonics is concerned that it has lost or may lose business opportunities and that the Secretary's designation of Dr. Gapontsev may affect the willingness of certain potential customers to work with IPG Photonics . . . ."); *id.* ¶ 69 ("IPG Photonics has reason to believe that it has not received product orders that it expected were going to be placed."); *id.* ¶ 99. But such speculative fears about *potential* impacts fail to show that Gapontsev has actually suffered an adverse determination. *See McCready*, 465 F.3d at 12 ("Quite simply, the text of the statute conditions relief upon a concrete, adverse determination."). Moreover, even if these worries did somehow set forth an adverse determination, that determination is adverse to *IPG Photonics*, but the Privacy Act requires that the predicate determination be "adverse *to the individual*." 5 U.S.C. § 552a(g)(1)(C) (emphasis added); *see also id.* § 552a(a)(2) (defining the term "individual").

Second, Gapontsev's claim does not show that the agency failed to maintain a record "with the degree of accuracy necessary to assure fairness in the determination." *McCready*, 465 F.3d at 10 (quoting *Deters*, 85 F.3d at 657). Under the Privacy Act, "[a] record can be 'accurate' (or inaccurate) only in relation to the state of affairs it is meant to describe." *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337 (D.C. Cir. 1992); *see also Akl v. Sebelius*, No. CV 08-0461(RBW), 2012 WL 12905168, at *5 (D.D.C. Sept. 7, 2012) (emphasizing that "the Court's limited role in a Privacy Act case . . . is to ensure that an agency record accurately and correctly reflects 'the

---

however, brings suit under § 552a(g)(1)(C), which requires an adverse determination and not merely adverse effect. *See Chambers*, 568 F.3d 998, 1007 ("Such an adverse effect, however, is not enough to make out a claim under subsection (g)(1)(C), which requires a specific "'adverse determination' resulting from an agency's failure to maintain accurate records.").

state of affairs it is meant to describe'" (quoting *Kleiman*, 956 F.2d at 337-38)).  In its report, Treasury specified the state of affairs it meant to describe—its list of Russian oligarchs identified those who have an estimated net worth of $1 billion or more.  CAATSA Report at 1.  "Those individuals who [met] this criterion [were] listed in [the list of oligarchs set forth in] Appendix 2 of th[e] report."  *Id*.

Gapontsev does not dispute the factual accuracy of this information—that he does indeed have a net worth exceeding $1 billion.  Rather, he contests the *criterion* that Treasury chose to employ in creating its list of oligarchs.  *See* Compl. ¶ 5 ("[T]here is no support in CAATSA that Congress intended the Secretary's public Russian oligarch designations to be based on the simple fact that an individual had $1 billion or more in assets . . . .").  But the Privacy Act "is not . . . a vehicle for amending the *judgments* of federal officials or . . . other[s] . . . as those judgments are reflected in records maintained by federal agencies."  *Kleiman*, 956 F.2d at 337-38 (quoting *Rogers v. U.S. Dep't of Labor*, 607 F. Supp. 697, 699 (N.D. Cal. 1985)) (emphasis and alterations in original).  Instead, it "allows for amendment of factual or historical errors," *id*. at 337 (quoting *Rogers*, 607 F. Supp. at 699 and Gapontsev identifies none.

Thus, Gapontsev's claim—which challenges the benchmark Treasury selected for identifying oligarchs, but without disputing any of the factual information actually reflected in Treasury's report—is simply "not the stuff of which Privacy Act suits are made."  *Id*. at 337; *see also id*. at 336-37 (rejecting a Privacy Act claim of a former federal employee that "his personnel records are inaccurate because they reflect [his job] title, not the work [he did in that position]" because those records "correctly reflect[ed] the position to which [he] officially was assigned" and "the description of what th[e] position entail[ed]"); *Ashbourne v. Hansberry*, No. 12-CV-01153 (BAH), 2015 WL 11303198, at *7 (D.D.C. Nov. 24, 2015) (rejecting a Privacy Act claim

where the plaintiff's "disagreement [lay] with the Agency's interpretation of documents . . . rather than its reliance on any factual errors"); *Akl*, 2012 WL 12905168, at *5 (rejecting a Privacy Act claim where "the plaintiff's challenges to the accuracy of the records go more to the judgment and opinions of the underlying decision to revoke the plaintiff's credentials than to the historical facts themselves").

Third, Plaintiffs cannot show that the CAATSA Report proximately caused any adverse determination. That report expressly states that the list was prepared "exclusively in response to Section 241 of CAATSA," that it is not a "sanctions list[s]," and that an individual's inclusion "does not and in no way should be interpreted to impose sanctions on those individuals or entities" or represent any "determination by any agency that any of those individuals or entities meet the criteria for designation" for sanctions. CAATSA Report at 2. The agency confirmed that a person's presence on the lists neither implies, nor gives rise to, nor creates any "restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons." *Id*. Plaintiffs are thus wrong to assert that the CAATSA Report has been "telling IPG's customers to either stay away or to invest in extra diligence." Mot. at 24. Plaintiffs' qualms are caused by the misunderstanding of third parties, not by the CAATSA Report.

For each of these reasons, the Court should dismiss Plaintiffs' APA claim.

## II.     Plaintiffs Make No Clear Showing that They Are Entitled to the Extraordinary and Drastic Remedy of a Preliminary Injunction

For the reasons set forth above, Plaintiffs' case should be dismissed. Yet even if this Court disagrees, where, as here, a plaintiff cannot demonstrate a likelihood of success on the merits, the motion for a preliminary injunction should be denied and the Court "need not proceed to review the other three preliminary injunction factors." *Elec. Privacy Info. Cntr. v. FTC*, 844

F. Supp. 2d 98, 101 (D.D.C. 2012) (quoting *Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d

815, 832 (D.C. Cir. 2009)).  Nevertheless, the remaining factors weigh against preliminary relief.

### A.    Plaintiffs Have Not Shown That They Will Incur Irreparable Harm Absent A Preliminary Injunction

The second factor requires a plaintiff to show a likelihood that she will suffer irreparable

harm in the absence of preliminary injunctive relief.  *Winter*, 555 U.S. at 20.  The D.C. Circuit

"has set a high standard for irreparable injury."  *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C.

Cir. 2008) (citation omitted).  To be irreparable, the injury must be both immediate and beyond

future remediation.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006).

> The key word in this consideration is irreparable.  Mere injuries, however
> substantial, in terms of money, time and energy necessarily expended in the
> absence of a stay are not enough.  The possibility that adequate compensatory or
> other corrective relief will be available at a later date, in the ordinary course of
> litigation weighs heavily against a claim of irreparable harm.

*Id.* at 297-98 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  In addition,

it is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm

cannot constitute an irreparable injury for purposes of injunctive relief.  *Wisc. Gas*, 758 F.2d at

674 (per curiam).  Rather, the harm must be "certain and great, actual and not theoretical, and so

imminent that there is a clear and present need for equitable relief to prevent irreparable harm."

*League of Women Voters of United States v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (quoting

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297)).

Plaintiffs' claims of harm fall far short of the "very high bar" for showing irreparable

injury.  *Coal. For Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162,

168 (D.D.C. 2008).  Aside from their assertion that they suffer irreparable harm because they

should win on the merits of their claims, *see* Mot. at 29-30; *see also Am. Civil Liberties Union*

*Found. v. Wash. Metro. Area Transit Auth.*, 303 F. Supp. 3d 11, 28 (D.D.C. 2018) (explaining that such arguments "link[] [Plaintiffs'] claim of irreparable harm to [their] showing of a likelihood of success on the merits," and thus their "failure to establish the latter is fatal to the former"), Plaintiffs rely on alleged injuries to their "business and revenue," "injury to their business goodwill," and harm to "their efforts to grow the government contract segment of their business," Mot. at 27-28.  However, "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms," *Air Transport Ass'n. of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (collecting cases), and "the law of this Circuit is clear that economic loss, in and of itself, does not constitute irreparable harm."  *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 80 (D.D.C. 2013).

Acknowledging that they rely on "economic losses," Plaintiffs nevertheless argue that "the difficulties of recovering them from the Government make them irreparable harm."  Mot. at 28 (citing, *inter alia*, *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)).  But "[t]his argument stretches too far."  *Air Transp. Ass'n of Am.*, 840 F. Supp. 2d at 335.  "[N]ot only is such a rule not the law of this Circuit, but it would also effectively eliminate the irreparable harm requirement," as it would mean that "[a]ny movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard."  *Id*.  Rather, "[t]he wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity."  *Id*.; *see also Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 115 (D.D.C. 2015) ("concur[ing] with the reasoning in *Air Transport Association*").

Here, Plaintiffs fail to identity any instance in which an individual or organization actually refused to contract with Plaintiffs as a result of the CAATSA Report.  Indeed, Plaintiffs do not even attempt to quantify the extent of their alleged harms.  Without doing so, they cannot satisfy their burden of establishing irreparable injury.[15]  *See Save Jobs USA*, 105 F. Supp. 3d at 115 ("Save Jobs has made no effort to quantify or even speculate as to the extent of its damage. . . . The court is left to speculate as to the magnitude of the injury, and speculation is not enough to turn economic loss into irreparable harm."); *Air Transp. Ass'n of Am*, 840 F. Supp. 2d at 336 ("For economic harm to constitute irreparable injury, however, Plaintiffs must adequately describe and quantify the level of harm its members face.") (internal quotation marks omitted).

Instead, Plaintiffs rely on questions they have received regarding Gapontsev's inclusion on Treasury's list (which they apparently answered), incorrect assumptions regarding the impact of that inclusion on IPG Photonics' ability to fulfill government contracts (despite plain language to the contrary in the CAATSA Report), "fears that some customers are not even raising the issue with the company," and unspecified orders that they expected but did not receive for some unspecified reason, *see* Mot. at 27-29.  But such purported harms boil down to "worr[ies]" that potential customers might "take [their] business elsewhere," *id.* at 27, and such speculation about potential economic harm is insufficient for demonstrating a likelihood of irreparable injury, *see Comm. in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991) (noting that irreparable harm is not present where plaintiff alleges "injuries neither extant nor presently threatened, but only merely 'feared'"); *Arriva Med. LLC v. Dep't of Health &*

---

[15] Plaintiffs suggest that legislation that has been introduced may "make it harder for IPG Photonics to be able to sell to the U.S. Government or to government contractors."  Mot. at 28. Enactment of such legislation is clearly speculative, and any irreparable injury that might arise would result from adoption of that legislation, and not Treasury's CAATSA Report.

*Human Servs.*, 239 F. Supp. 3d 266, 277 (D.D.C. 2017) (noting that "a plaintiff must, at minimum, 'demonstrate that irreparable injury is likely in the absence of an injunction,' not just that injury is a 'possibility'" (quoting *Winter*, 555 U.S. at 21)).

Same with the alleged harm to Plaintiffs' "business reputation or goodwill."  Mot. at 29. "[A]s with all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative."  *Trudeau*, 384 F. Supp. 2d at 297; *see also Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 220 (D.D.C. 1996) (rejecting arguments regarding reputational harm where they were "based solely upon conjecture").  Plaintiffs provide no such concrete and corroborated irreparable harm here, as the questions and mistaken assumptions that they cite are readily answered by the report itself, and in any event, do not reflect irreparable injury.

 Moreover, Plaintiffs' failure to promptly seek preliminary injunctive relief "stands in stark contrast to the high bar the plaintiffs must clear to show irreparable harm."  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).  "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  *Id.* (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).  That delay occurred here.

Plaintiffs filed the instant suit on December 3, 2018—more than ten months following issuance of Treasury's January 29, 2018 report.  ECF No. 1.  Even then, Plaintiffs still waited for a considerable period of time before filing their motion for preliminary relief.  "The D.C. Circuit has found that a delay of forty-four days before bringing [an] action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,'" *Open Top Sightseeing USA*, 48 F. Supp. 3d at 90 (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987

(D.C. Cir. 1975)), and the longer delay here confirms that preliminary relief is inappropriate, *see also, e.g.*, *AARP v. EEOC*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) (finding no irreparable harm where the final rules at issue "were promulgated in May 2016, yet [the plaintiff] waited until the end of October to file this suit").[16]

Because Plaintiffs cannot satisfy the "high standard for irreparable injury," *In re Navy Chaplaincy*, 534 F.3d at 766, Plaintiffs' Motion fails for this independent reason, *see Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (if party makes "no showing of irreparable injury," court may deny motion "without considering the other factors").

### B.    The Balance of Equities Favor Treasury

The final two preliminary injunction factors—the balance of the equities and the public interest—tend to "merge" in cases where relief is sought against the Government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs have failed to show that "the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and third parties" and that "granting the preliminary injunction would be in the public interest." *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 7-8 (D.D.C. 2002) (citation omitted).  To the contrary, those factors weigh heavily against Plaintiffs' request.

Rather than preserve the status quo pending final adjudication, Plaintiffs demand that this Court edit an already-published report that was required, by statute, to be submitted to Congress *more than a year ago*.  *See* CAATSA § 241(a).  Congress charged Treasury with the responsibility to identify oligarchs, *see* CAATSA § 241(a)(1)(A), and the agency did so in the

---

[16] Plaintiffs exhibited similar delay before filing suit.  For example, their earliest documented communication to Treasury came more than six weeks after Treasury delivered the report, and that communication does not even mention harm or injuries resulting from Gapontsev's inclusion on Treasury's list.  ECF No. 15-1 at 1-2.

unclassified portion of the report using "objective criteria related to an individuals' . . . net worth of $1 billion or more," CAATSA Report at 1.  Plaintiffs' request that this Court disrupt these congressional and agency determinations, *cf. Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008) ("[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce."), even though the report itself explains it "in no way should be interpreted to impose sanctions on those individuals or entities" or represent any "determination by any agency that any of those individuals or entities meet the criteria for designation" for sanctions.  CAATSA Report at 2.  Plaintiffs seek to justify this micromanagement by assuming that they succeed on the merits of their claims, *see* Mot. at 30-32, but as explained above, they are unlikely to do so, "meaning that a preliminary injunction would likely have no effect on public officials' compliance with the law," *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 68 (D.D.C. 2017).  And their assertion that the "public interest would be furthered by IPG's continuing success," Mot. at 32, apparently relies on their speculative purported injury that does not support the extraordinary relief that they seek.

Moreover, it is not the role of the Court nor the purpose of a preliminary injunction to dictate the contents of an Executive Branch report to Congress that implicates national security and foreign relations concerns.  Plaintiffs themselves acknowledge that "Congress viewed [CAATSA] as a necessary response to Russian Government interference in U.S. elections, cyber-attacks, and military aggression in the Ukraine and Syria," Mot. at 9 (citing CAATSA §§ 211, 212, 222-224, 241), and it should not surprise given that context that Congress's requested information (which it demanded in an unclassified report while allowing for a classified annex) may cast some in an unflattering light.  But unflattering does not mean illegal, and the Audit

Report explains how Treasury reasonably responded to Congress's request—drawing on public information "to assemble a list of wealthy Russians and senior political figures" that "would further distinguish this from a sanctions list" while "reduc[ing] the possibility of asset flight." Audit Report at 6.  The Supreme Court has repeatedly emphasized that "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see also Regan v. Wald*, 468 U.S. 222, 242 (1984), and Plaintiffs provide no reason to conclude otherwise here.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction and dismiss this case.

Dated:  March 13, 2019                          Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General

DIANE KELLEHER
Assistant Director, Federal Programs Branch

/s/ Kevin M. Snell
KEVIN M. SNELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C.  20005
Tel.: (202) 305-0924
Fax: (202) 616-8460
E-mail:  Kevin.Snell@usdoj.gov

*Attorneys for Defendant*